McCann, J.
INTRODUCTION
For the Commonwealth — Assistant District Attorney, James R. Lemire.
For the Defendant — Michael H. Elrich, Esq.
On April 5, 2002, a Worcester County grand jury indicted Andres Lora, (“the Defendant”) on charges of Trafficking in Cocaine in violation of G.L.c. 94C, §32E(b). The Defendant filed a Motion to Suppress Seized Evidence, alleging violations of his rights pursuant to the Fourth and Fourteenth Amendment of the United States Constitution, Articles 1, 10, 12 and 14 of the Massachusetts Declaration of Rights, and G.L.c. 276, §1 et seq.[1] For the reasons set forth below, the Defendant’s Motion to Suppress is ALLOWED as to both evidence seized and any statements of the Defendant.
BACKGROUND

February 20, 2001

On the evening of February 20, 2001, Massachusetts State Trooper Brendan Shugrue (“Shugrue”) was patrolling the area of Route 290 East in Auburn, Massachusetts. At approximately 9:10 p.m., he entered and was traveling the center eastbound lane on 290. He was on routine patrol, and was patrolling at a surveillance speed of 75 to 85 m.p.h. As he did so, he approached and observed a motor vehicle traveling ahead of him in the left-hand lane. There was no traffic in the center lane or in the right hand travel lane. The vehicle, a four-door Pontiac Grand Am (“Pontiac”), traveled within the posted speed limit; did not swerve from side to side; made no erratic movements; had no visible equipment problems; and it did not pass any cars in either the center or right lanes as there was no traffic in those two lanes.
Interstate 290, in the area in question, is a well-lit road lighted by streetlights. As Shugrue approached the motor vehicle he moved into the left lane behind the motor vehicle in question. He observed that the occupants made no furtive or suspicious movements. Shugrue did not run a check on the license plate. Shugrue followed the vehicle for one half of a mile to an area near the Auburn Street exit, near the border *716 of Worcester. When he first observed the motor vehicle he was unable to determine the racial features of the occupants, but as he approached the motor vehicle, and before initiating the stop or turning on his overhead lights to effectuate the stop, he observed and determined that the two occupants were both dark skinned. At the time he made the observation about the occupants being dark skinned, he had been following the motor vehicle a short distance while being 5 to 6 car lengths, or approximately 120 feet, behind the motor vehicle. He made the traffic stop of the •vehicle for the traffic offense of traveling in the left lane while the center and right lanes were unoccupied.[2] Shugrue activated his cruiser’s blue lights. The Pontiac’s driver then tossed a cigarette butt out the window.[3] Although the thrown cigarette may be considered a motor vehicle offense of littering, the sole reason the Pontiac was stopped by Shugrue was for failure to keep to the right. Making a stop for failure to drive to the right is considered a discretionary stop by the police and the state police.[4] He was not stopped for littering.
There was nothing out of the ordinary about the stop. When Shugrue activated his blue lights, the Pontiac pulled to the right side of the road into the breakdown lane. For reasons of officer safety, Shugrue approached the vehicle from the passenger’s side.
Shugrue asked for the driver for his license and registration. The driver produced neither. He explained that his license had been suspended. Shugrue asked who owned the vehicle, and the driver pointed to the passenger, the Defendant Andres Lora. At the trooper’s request, the Defendant produced his license and registration.
There is no evidence before this Court about any of the actual conversations between Shugrue and the Defendant, or what was actually said by either. Evidence hereinafter referred to suggest that the Defendant was able to speak very little English. Shugrue opined early on in the stop that there was a language barrier, and that the Defendant spoke little, but not much English. The Defendant produced a license and registration. Shugrue asked the driver to step out of the car. Shugrue then returned to his cruiser. The operator was placed in the back of the cruiser while Shugrue made the appropriate checks. He ran the operator’s name and the Defendants name through his computer to determine that the operator was, in fact operating after suspension and whether the Defendants license and registration were valid. It was the intention of Shugrue to let the Defendant drive the motor vehicle from the scene if his license and registration proved to be valid. The operator’s license was reported back as suspended. The Defendant’s license and registration were both reported back as valid. Simultaneously, Shugrue observed the Defendant talking on his cell phone. He observed the Defendant open the passenger-side door, turn to the side, and turned as if appearing to get out. The adjacent area outside was wooded. Shugrue got out of his cruiser and approached the Pontiac and was about to tell the Defendant to get back into his motor vehicle. As he approached the Defendant got back into the Pontiac and shut the door.
Shugrue shined his flashlight inside the vehicle. He observed a small glassine bag on the driver’s side floor, which contained a white powder which the he opined to be cocaine. Shugrue asked the Defendant to step outside the vehicle and frisked him. He asked him to wait at the front of the Defendant’s motor vehicle while he retrieved the baggies.
Shugrue called the barracks to request the assistance of a canine unit. The canine officer was unavailable, so Trooper William Pinkes (“Pinkes”), Shugrue’s line mate, offered assistance. Line mates are troopers that work together frequently on cases, work the same shifts, and have the same days off. Both Shugrue and Pinkes have taken classes in traffic stops and have received state and federal law enforcement training in conducting drug interdiction stops on state highways. The troopers have made numerous traffic stops and drug arrests during in their years of experience with the State Police.
Approximately ten-to-fifteen minutes later, Pinkes arrived at the scene. Upon arrival, Shugrue informed him that he had recovered what he opined to be drugs and asked Pinkes for assistance in searching the Pontiac and that he wished to search the motor vehicle. No arrests had been made at this point. During the search, Pinkes acted as a cover officer, a trooper that provides back up by monitoring suspects while the investigating trooper performs his duties.
Shugrue had trouble opening the locked trunk. He asked the Defendant to help him open the trunk, and he did. In the trunk, next to the spare tire, the trooper found a package wrapped in cellophane. He opined that the package was consistent with the packaging of narcotics. He cut the tape surrounding the package and found a white powder, which was later determined to be cocaine. The troopers estimated the weight to be approximately one kilogram. Pinkes placed the Defendant under arrest, handcuffed him, and placed him in his cruiser. The vehicle was towed to the Holden barracks where it was searched by a canine. No additional narcotics were found during the search at the barracks. There is no evidence before this Court as to when the operator was placed under arrest.
At the barracks, using the assistance of an unknown AT&T language assistance telephone operator who acted as aSpanish-language interpreter, Shugrue booked the Defendant. During booking, the Defendant acknowledged that the substance found in the Pontiac was cocaine, which he bought for $26,000 in a vehicle-to-vehicle transaction in the Bronx, New York. The Defendant further explained that he intended to sell the cocaine for $30,000.
*717 Statistical Evidence
At the evidentiary hearing, the Defendant introduced numerous pages of statistics and statistical analyses of state police stops of minority drivers, including: an analysis of all motor vehicle stops conducted by Shugrue during the period in which the Defendant was stopped, August 22, 2001-February 18, 2002; an analysis of all motor vehicle stops conducted by Pinkes during the period of June 16, 2001-August 3, 2001; demographics, as compared to the general demographics of the town of Auburn, as they relate to stops conducted by Shugrue and Pinkes; analyses of twenty stops conducted by troopers from the Holden barracks, including Pinkes and Shugrue; and a Boston Globe article that ranks Massachusetts towns by disparity in minority searches.
The Commonwealth objected to the introduction of the statistical evidence on relevance grounds. The Court admitted the evidence de bene. At the close of the evidence, the Commonwealth neither moved to strike[5] the statistical evidence, nor asked for additional time to present statistics to rebut the Defendant’s allegations.
This Court has carefully reviewed and weighed the statistical evidence and accepts the following statistical information as both credible and relevant to the case at bar:
Demographics — Auburn:
Auburn encompasses the convergence of Interstate highways 290, 395, 90, and Routes 12 and 20;
The general demographics for the town of Auburn for Caucasian, African-American and Hispanic residents are 97.5%, 1% and .6%, respectively; and
The general demographics for the city of Worcester for Caucasian, African-American and Hispanic residents are 77.1%, 15.1%, and 8%, respectively.
Trooper Shugrue — Auburn:
Of the 252 total stops made by Shugrue from August 22, 2001 to February 18, 2002, 198, or 54.9%, involved Caucasian operators, 29, or 31.3%, involved Hispanic operators, and 16, or 11.76%, involved African-American operators;
Non-inventory searches occurred in 7.1% of the overall stops;
Non-inventory searches occurred in 5.1% of the stops of Caucasian operators, in 20.1% of the stops of Hispanic operators, and in 12.5% of the stops of African-American operators for a total of 32.6% minority stops;
An African-American operator was 2.5 times more likely to be searched than a Caucasian operator, and an Hispanic operator was 3.9 times more likely to be searched than a Caucasian operator;
A minority was 6.4 times likely to be searched than a Caucasian; and
Of the 11 searches conducted in Auburn, 7, or 70%, involved minority operators;
The differential in demographic characteristics versus Shugrue’s stops of Caucasian, African-American, and Hispanic operators in Auburn is 56.3%, 3,137%, and 1,960%, respectively;
The percentage of Hispanics that Shugrue stopped in Auburn is 1,960% higher than that of the general population of the town.
Trooper Shugrue — Worcester:
Of those stopped in Worcester, Caucasian operators accounted for 85.06%, Hispanic operators accounted for 8.05%, and African-American operators accounted for 4.6%;
The differential in demographic characteristics versus Shugrue’s stops of Caucasian, African-American, and Hispanic operators in Worcester is 110.32%, 53.31%, and 57.5%, respectively;
The percentage of Hispanics that Shugrue stopped in Worcester is 53% higher than that of the general population of the city; and
When the statistics for Auburn and Worcester were combined, Shugrue had a minority search rate of 33.19%, a Caucasian search rate of 5.05% and a disparity of 6.6; this disparity is 3.7 times greater than that of the Massachusetts State Police and 13.3 times that of the Massachusetts State Police’s minority search rate.

Trooper Pinkes:

Non-inventory searches occurred in 13.68% of the overall stops;
Non-inventory searches occurred in 1.9% of the stops of Caucasian operators, in 28% of the stops of Hispanic operators, and in 41.67% of the stops of African-American operators;
An African-American operator was 21.9 times more likely to be searched than a Caucasian operator and a Hispanic operator was 14.7 times more likely to be searched than a Caucasian operator;
A minority operator was 36.6 times more likely to be searched than a Caucasian operator;
Of the 4 searches conducted in Auburn, 4, or 100%, were of minority operators;
Non-inventory searches took place in 32.4% of the 37 stops of minority operators; and
Pinkes had a minority search rate of 69.67%, a Caucasian search rate of 1.58%, and a disparity of 37.7, this is 21 times greater than that of the Massachusetts State Police and 28 times that of the Massachusetts State Police’s minority search rate.
This Court, in its discretion, elects not to credit the statistics regarding the arrest rates of various other state troopers proffered by the Defendant. Unlike the *718 objective measurements of traffic stops and demographic data, the Defendant derived these arrest statistics by selecting 20 other arrests, which he believes resemble the facts of this case. An analysis based on such a small sample of cases handpicked by defense counsel is too subjective to merit inclusion in this Court’s findings of fact and rulings of law, and they are therefore disregarded.
DISCUSSION
Evidence Admitted De Bene
It is within the court’s discretion to admit evidence de bene, or subject to the condition that the moving party establishes foundation at a later point in a proceeding before the court. Commonwealth v. Johnson, 199 Mass. 55, 59 (1908). Such evidence maybe heard upon the representation that its relevance (or admissibility) will be established by future testimony or documents. Pocket Guide to Massachusetts Evidence (MCLE 1999), 21.
Objections must be taken at the time the evidence is offered, but objections must be seasonably made. Commonwealth v. Baptiste, 372 Mass. 700, 706 (1977). Therefore, the objecting party may object to evidence admitted de bene at the time it is offered but must also move to strike the evidence at the moment it becomes apparent the offering party has not and can no longer establish relevance. Id.
The court has no duty to strike unsubstantiated, de bene evidence on its own motion. Commonwealth v. Sheppard, 313 Mass. 590, 595-96 (1943). Rather, the objecting party must move to strike conditionally admitted de bene evidence. Sheppard, 313 Mass. 590 at 595-96; Johnson, 199 Mass. at 59; Peterson v. Gautan, 404 F.2d 1375, 1379 (1968) (interpreting Massachusetts law). The objecting party’s failure to move to strike the evidence “gives them no ground upon which to support their earlier objection.” Johnson, 199 Mass. at 59.
The failure to move to strike de bene evidence is treated as an intelligent waiver of the right to object. Peterson v. Gaughan, 404 F.2d 1375, 1379 (1968), citing Johnson v. Zerbst, 301 U.S. 458, 464 (1938). This is particularly true when, at the time the evidence is first offered, the court advises the objecting party that he may move to strike at the close of the evidence. Wilburg v. Denzel, 359 Mass. 279, 283 (1971); Muldoon v. West End Chevrolet, Inc., 338 Mass. 91, 98 (1958); Peterson v. Gaughan, 404 F.2d at 1379.
In Ebersteen v. Kassler, the answer to a hypothetical question, for which inadequate foundation had been laid, was nevertheless properly admitted because the objecting party failed to renew its motion to strike at the close of the evidence. 1 Mass.App.Ct. 824, 825 (1973). Similarly, in Wilburg, the court refused to admit evidence because the defendant failed to move to strike at the close of the proceedings. Wilburg, 359 Mass. 279 at 283. In its decision in Wilburg, the Supreme Judicial Court refused to address the admissibility of the de bene evidence because the defendant’s failure to object foreclosed his right to challenge admissibility on any theory. Id.
In this case, the Court admitted the Defendant’s affidavits de bene, on the condition that the Defendant lay a proper foundation through the introduction of additional evidence. In answer to the Commonwealth’s exception, the Court advised the Commonwealth that it could move to strike at the close of the evidence. At the close of the evidence, the Commonwealth neglected to move to strike. As in Wilburg, Johnson, and Muldoon, the Commonwealth’s failure to move to strike the evidence constituted a waiver of the right to object to its admissibility on any theory. Wilburg, 359 Mass. at 283; Johnson, 199 Mass. at 59; Muldoon, 338 Mass. at 98. Accordingly, the statistical evidence is properly before this Court for consideration.
Constitutionality of the Traffic Stop Routine Traffic Stops
The temporary detention of individuals during an automobile stop, even if only brief and for a limited purpose, constitutes a seizure for Fourth Amendment purposes. Whren v. United States, 517 U.S. 806, 809-10 (1996). Therefore, an officer must have a reasonable and articulable suspicion to stop an individual. Terry v. Ohio, 392 U.S. 1, 21 (1968).
To adhere to the constitutional imperatives of the Fourth Amendment, the stop must be reasonable in the circumstances. Whren, 517 U.S. at 810. In determining reasonableness, the court must consider whether the facts known to the officer at the time of the stop would warrant an officer of reasonable caution to suspect criminal activity. Terry, 392 U.S. at 21. Good faith on the part of the officer is not enough. Id. at 22. An officer’s conclusion must be drawn from reasonable inferences based on the facts in light of his training and experience. Id. at 27.
The principles set forth in Terry apply to stops of both pedestrians and motor vehicles. Commonwealth v. Bacon, 381 Mass. 642, 643 (1980). “As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred.” Whren, 517 U.S. at 809-10, citing Delaware v. Prouse, 440 U.S. 648, 659 (1979).
Massachusetts applies the so-called “authoritarian” approach to motor vehicle stops, meaning that a stop is valid as long as it is one police are “legally permitted and objectively authorized” to make. Commonwealth v. Santana, 420 Mass. 205, 209 (1995), quoting United States v. Trigg, 878 F.2d 1037, 1041 (7th Cir. 1989). In Whren, the United States Supreme Court (“Supreme Court”) adopted the same rule and declared that an officer is permitted to stop a vehicle any time he observes a traffic violation. 517 U.S. at 818-19. Accordingly, while the law prohibits police from randomly stopping a vehicle to check a driver’s license and registration, it allows a stop any time *719 police observe a traffic violation. Santana, 420 Mass. at 207, citing Bacon, 381 Mass. at 643. The fact that an officer may believe that an individual is engaged in criminal activity does not limit his power to make an otherwise authorized, motor vehicle stop. Santana, 420 Mass. at 208.
There is nothing within the facts of this case to support that Shugrue, when he observed the motor vehicle in the left-hand lane with no traffic in the middle or right lanes, had reason to believe that the occupants of the vehicle had committed, were committing, or were about to commit a crime. A strict reading of Massachusetts law supports that Shugrue was authorized to stop the Pontiac for traveling in the left-hand lane.[6]
The Defendant, however, asks this Court to address, for the first time, whether a legitimate stop may withstand state and federal scrutiny when objective evidence suggests the stop was based not on the underlying traffic violations of failure to drive in the right hand lane, but on the Defendant’s race.
The Racial Profiling Dilemma
It is difficult to reconcile the Fourth Amendment authoritarian approach with the protections provided to citizens by the Fourteenth Amendment’s Equal Protection Clause. ‘The use of automobiles is so heavily and minutely regulated that total compliance with traffic and safety rules is nearly impossible ... [A] police officer almost invariably will be able to catch any given motorist in a technical violation. This creates the temptation to use traffic stops as a pretext, or as a means of investigating other law violations, as to which no probable cause or even articulable suspicion exists.” Whren, 517 U.S. at 818-19. To guard against the potential for such abuse, the United States Supreme Court has routinely concluded that a stop is not constitutional if it is predicated on race alone. Whren, 517 U.S. at 818-19 (1996); United States v. Brignoni-Ponce, 422 U.S. 873, 885-86 (1975) (involving border checkpoints); United States v. Avery, 137 F.3d 343, 355 (6th Cir. 1997) (regarding airport detentions). However, by removing the officer’s subjective intent from a court’s analysis of a traffic stop, the Supreme Court, in Whren, effectively eliminated a defendant’s ability to challenge a stop on race-based grounds. See Whren, 517 U.S. 806.
The Massachusetts appellate courts have yet to resolve the conflict that arises when a well-substantiated allegation of racial profiling is made within the context of a legitimate traffic stop. In his concurring opinion in Commonwealth v. Gonsalves, 429 Mass. 658 (1999), the case in which the Supreme Judicial Court refused to adopt the federal, automatic exit order rule, Justice Ireland cautioned, ‘The widespread public concerns about police profiling, commonly referred to as ‘DWB’ — driving while black,[7] has been the subject of much discussion and debate both across the country and within the Commonwealth . . . Other courts have [] recognized racial profiling and ‘DWB’ as areal cause for concern.” Gonsalves, 429 Mass. at 670 (Ireland, J., concurring).[8] The Associate Justice supported his concurrence by citing statistics from numerous research studies and publications; including the Boston Globe study introduced by the Defendant in this case, in an effort to demonstrate the overwhelming national concern about racial profiling. Id. (and materials cited).
The New Jersey Response
Although Massachusetts has yet to directly address this issue, the New Jersey courts have been at the forefront of addressing claims of racial profiling and have attempted to create a body of law that strikes the appropriate balance between the promises of the Fourth and Fourteenth Amendments and the compelling need for drug interdiction on state highways. As the New Jersey Supreme Court stated in State v. Soto, “the eradication of illegal drugs from our state is an obviously worthy goal, but not at the expense of individual rights.” 324 N.J.Super. 66, 85 (1996).
Like Massachusetts, which sometimes expands on federal rights, New Jersey adheres to the more stringent, authoritarian approach to motor vehicle stops, allowing an officer to make a stop any time he observes a traffic violation and regardless of his subjective motivations. State v. Kennedy, 247 N.J.Super. 21, 27 (App.Div. 1991). Also like Massachusetts, the New Jersey courts interpret their state constitution’s Equal Protection provision in the same way that the federal courts interpret the Fourteenth Amendment. State v. Maryland, 167 N.J. 471, 485 (2001); Mendoza v. Commonwealth, 423 Mass. 771, 779 (1996). Therefore, this Court looks to New Jersey’s substantial body of racial profiling case law for guidance in reaching a conclusion in this case.
The New Jersey Supreme Court has held that the objective reasonableness standard is not satisfied when the only reason for the search or the stop is the individual’s race. Maryland, 167 N.J. at 485, citing State v. Bruzzese, 94 N.J. 210, 219 (1983). Notwithstanding the authoritarian view mandated by both the federal and New Jersey constitutions, courts have suppressed evidence on Fourteenth Amendment grounds when; (1) the defendant through statistical evidence, made out a viable claim of selective enforcement of the applicable traffic laws; or (2) the court disbelieved the officer’s testimony regarding the occurrence of the traffic violation on which the stop was predicated.
In Kennedy, the New Jersey court ruled that the objective reasonableness test does not foreclose inquiry into whether an Equal Protection violation occurred through selective enforcement. 247 N.J.Super. at 27. Rather, the relevant inquiry focuses on the existence or non-existence of a course of conduct that presumably can be proven or disproved by objective evidence. Id. at 29-30. If the defendant raises an *720 inference of selective enforcement, the New Jersey courts require the government to supply a race-neutral reason or compelling government interest for the stop. Maryland, 167 N.J. at 486.
An inference of selective enforcement can be raised through statistical evidence or through the establishment of a pattern of conduct. Kennedy, 247 N.J.Super. at 29-30. Such an inference can also be drawn based on the totality of the facts and circumstances presented in one specific case. Maryland, 167 N.J. at 486.
In Kennedy, the court discussed the racial profiling issue in the context of pre-trial discoveiy and allowed the defendant access to documents that might establish a pattern of unconstitutional conduct on the part of the arresting officer. Kennedy 247 N.J.Super. at 29-30. In Soto, the court suppressed evidence based on a statistical analysis, which revealed that the disparity in minority versus non-minority stops was 242%. Soto, 324 N.J.Super. at 70-71.[9] The court held that “where objective evidence establishes that a police agency has embarked upon a . . . de facto policy of targeting minorities for investigation or arrest, any evidence seized will be suppressed to deter future insolence in office by those charged with the enforcement of the law and to maintain judicial integrity.” Id. at 83-84, quoting Kennedy, 247 N.J.Super. 21 at 29.
In Maryland, the New Jersey Supreme Court held that a field inquiry based solely on race was defective. 167 N.J. at 484. The police saw a defendant whom they recognized from a prior occasion, place a brown paper bag in the waistband of his pants as he exited a commuter train. Id. at 477-78. The court determined the officers’ reliance on the fact that the defendant was one of three black males who frequented the train station raised an inference of selective law enforcement and held that “although a field inquiry may be conducted when the police have not observed the suspect. . . engage in any suspicious activities, such an inquiry is impermissible if it is based on race.” Id. at 477. The court found that contradictory evidence contained in three police reports and an inconsistent version of the defendant’s previous encounter with police were insufficient to rebut the appearance of race-based discrimination on the part of the officers and concluded that the evidence supported no more than a hunch that the defendant was carrying contraband. Id. at 484-85 (holding “hunch” insufficient to rebut inference of discriminatory enforcement).
The Maryland court, suppressed the evidence seized because the totality of the record left no reasonable conclusion but that the police stopped the defendant because of his race. Id. at 477. “Because an inference of selective law enforcement was raised, and because there were disparate and inconsistent versions of the defendant’s encounter with the police, the State was required to have established a non-discriminatory basis for the officers to conduct a field inquiry.” Maryland, 167 N.J. at 486.
Equal Protection
It appears that the proper method for challenging searches and seizures based on grounds of racial profiling is not the Fourth Amendment and Article 14 of the Massachusetts Declaration of Rights, but the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution and Articles 1 and 10 of the Massachusetts Declaration of Rights; and it is against this backdrop that the Defendant’s claims must be addressed. Both the state and federal Equal Protection Clauses provide the Defendant with a constitutional guarantee that prohibits the discriminatory application of facially impartial laws. Commonwealth v. Franklin Fruit Co., Inc., 388 Mass. 228, 229-30 (1983). However, it is equally established that law enforcement officials enjoy a great deal of discretion in the execution of their duties. Commonwealth v. Franklin, 376 Mass. 885, 894 (1978).
To demonstrate an Equal Protection violation, the moving party must show that the defendant’s action had a discriminatory effect and was motivated by a discriminatory purpose. Arlington Heights v. Metro. Housing Dev. Corp., 429 U.S. 256, 272-74 (1977). Once a prima facie case for discrimination is made, the burden shifts to the government to rebut the presumption. Castaneda, Sheriff v. Partida, 430 U.S. 482, 493 (1977).
To show a discriminatory effect, the moving party must demonstrate that: they are members of a protected class; they are otherwise similarly situated to members of an unprotected class; and that they were treated differently. Chavez v. Illinois State Police, 251 F.3d 612, 636 (7th Cir. 2001). It is well-settled that African-Americans and Hispanic-Americans are members of protected classes and, therefore, are entitled to the highest standard of scrutiny provided by law. See e.g., Brignoni-Ponce, 422 U.S. 873.
A party may show that he was similarly situated yet treated differently by identifying individuals who received disparate treatment or by using statistics to demonstrate a significant disparity. Armstrong, 517 U.S. at 467; Chavez, 251 F.3d at 637. When statistics are introduced, they must address the issue of whether one class is being treated differently than others similarly situated. Id. at 638.
In Armstrong, the United States Supreme Court rejected the petitioner’s argument that he was prosecuted for a drug crime based on his race because he failed to point to cases in which non-minorities, similarly situated, were not prosecuted in similar factual circumstances. United 517 U.S. at 470. In Chavez, however, the Seventh Circuit refused to apply the Armstrong rationale to a racial profiling case, reasoning that it would be impossible for the moving party to provide the names of similarly situated motorists who were not stopped for committing the same traffic violations as those targeted by police. 251 F.3d 612 at 640. “In light of Armstrong, statistics demonstrating *721 that whites were stopped for traffic violations were not detained and searched . . . while similarly situated African-American or Hispanic drivers were detained and searched, would be sufficient to show discriminatory effect.” Id. at 639.
The Defendant in this case has presented precisely this type of evidence. The Defendant’s statistics show that Shugrue conducted non-inventory searches in 20.1% of stops involving Hispanic operators, more than five times his search rate for Caucasian operators. Statistics also establish that, during the relevant time period, 70% of the targets of Shugrue’s Auburn non-inventory searches were either African-American or Hispanic. Moreover, as compared to the general demographics of the town of Auburn, Shugrue stopped Hispanics at a rate 1,960% greater than that of Caucasians. Given the obvious challenges discussed by the Seventh Circuit in Chavez, the Defendant has provided sufficient information to demonstrate that minority drivers were stopped and searched with greater frequency than non-minority drivers. Id.
An official act however, is not unconstitutional solely because it has a racially disproportionate impact. Partida, 430 U.S. at 492-93. To prevail on an Equal Protection claim, the petitioner must further demonstrate that the decision makers in his case acted with a discriminatory purpose. McCleskey v. Kemp, 481 U.S. 279, 294 (1987). This requires evidence that the decision maker intended to pursue a course of action at least in part because of its adverse effects on an identifiable group. Id. at 298.
Discriminatory intent can be inferred by a stark pattern. Gomillion v. Lightfoot, 364 U.S. 339 (1966); Yick Wo v. Hopkins, 118 U.S. 356 (1886) (finding stark pattern when San Francisco denied licenses to 99% of Asian-American applicants). A specific sequence of events leading up to the challenged decisions may shed light on the decision maker’s purpose. Arlington Heights v. Metro. Housing Dev. Corp., 429 U.S. 256, 268 (1977). Discriminatory purpose may be also inferred from the totality of the relevant facts, including the fact that the law bears more heavily on one race than another. Avery, 137 F.3d at 355.
Because discretion is essential to the administration of the criminal justice process, the court demands exceptionally clear proof before it can infer abuse of discretion. McCleskey, 481 U.S. at 297. Statistics often form the basis for proving a pattern of discrimination. See id. Ordinarily, the law requires that these statistics demonstrate a stark pattern, but in certain, limited contexts the courts find discrimination when the pattern presented is less extreme. McCleskey, 481 U.S. at 294; Soto, 324 N.J.Super. at 84.
The Supreme Court had accepted less-extreme statistical patterns in cases involving Title VII civil rights violations and use of peremptory challenges in jury venire. McCleskey, 481 U.S. at 294. The court distinguishes these cases because the statistics involved relate to a small number of entities; few variables are relevant to the challenged decision; and the decision maker has the opportunity to explain the statistical disparity, which allows the court to exercise its discretionary function. Id. at 296.
In Title VII cases, the court reasoned: “While employment decisions may involve a number of relevant variables, these variables are to a great extent uniform for all employees because they must all have a reasonable relationship to the employee’s qualifications to perform a particular job at issue.” Id. at 295 n.14. A court may infer discriminatory intent because the cases involve a small number of variables and involve salary and job qualification, which are easily quantified. Bazemore v. Friday, 478 U.S. 385, 400-01 (1986) (noting plaintiff need not prove discrimination to “scientific certainty”).
The jury-venire context also provides the court with sufficient information from which to infer invidious discrimination. It is well-settled that an attorney may exercise peremptory challenges for virtually any reason except race. Batson v. Kentucky, 476 U.S. 79, 88-89 (1986). In Batson, the court explained that purposeful discrimination could be inferred if “in case after a case, whatever the circumstances, whatever the crime, and whoever the defendant or the victim may be” the prosecutor used his peremptory challenges to strike minorities from juries. Id. at 91-92.
Courts reason that, in jury venire, the factors of selection are objective and identifiable. McCleskey, 481 U.S. at 295 n.14. This allows the trial judge to exercise his discretion in determining whether a peremptory challenge is based on racial grounds. Commonwealth v. Curtiss, 424 Mass. 78, 82-83 (1997). The court must make a factual inquiry that takes into account all possible explanatory factors and may consider both circumstantial and direct evidence. Batson, 476 U.S. at 95. The petitioner may prove discrimination by showing a pattern of exclusion from a number of juries. Id. at 94.
Circumstantial evidence of invidious intent may include the disparate impact Id. at 93. In some circumstances, proof of discriminatory impact may for all practical purposes demonstrate unconstitutionality because in various circumstances the discrimination is very difficult to explain on nonracial grounds. Id.
The combination of a state actor’s pattern of conduct and a history of discrimination by a government office supports a finding of discriminatory intent. Miller-El v. Cockrell, 123 S.Ct. 1029, 1044 (2003). In 2003, the Supreme Court, in Miller-El v. Cockrell held that a “jury shuffle” or rearrangement in juror seating and the prosecutor’s use of different questions for black and white jurors violated Equal Protection. Id. The court concluded that these acts, plus a history of racial discrimination at the district attorney’s office, *722 gave rise to an inference of the government’s discriminatory intent. Id.
Outside the jury-venire and Title VII contexts, courts’ reliance on statistics as evidence of discrimination is far less predictable, particularly when it comes to allegations of racial profiling by law enforcement. It is clear that the courts disfavor the application of general statistics to individual defendants. McCleskey v. Kemp, 481 U.S. 279, 294. In McCleskey, the defendant presented statistical evidence that, as applied, the Georgia death penalty statute resulted in disproportionate sentencing of black defendants who killed white victims. 481 U.S. 279 at 291-92. Although the court found the evidence compelling, it refused to reverse the defendant’s death sentence because the statistics failed to show that the government purposefully discriminated against him. Id. The court based its decision, in part, on the inherent difficulties of proving purposeful discrimination in the application of the death penalty statute, explaining that the decision to seek the death penally rests with numerous individuals working in many departments of state government. Id.
In Chavez, the plaintiffs asked the court to determine that statistical evidence relating to an entire department evidenced a pattern of racial profiling on the part of individual officers. Chavez, 251 F.3d 612 at 647-48. The court rejected the plaintiffs’ Equal Protection claim because they relied on a database that did not record the race of the motorists stopped; failed to adduce evidence of the number of minority drivers traveling the Illinois state roadways; and based their analysis on field reports completed at the officer’s discretion. Chavez, 251 F.3d 612 at 641-44. Without this information, too many outstanding variables existed to make out a prima facie case of selective enforcement. Id. at 644.
On the other hand, in Kennedy, a study of public defender’s office cases and affidavits submitted by individuals who had complained to the ACLU supported an inference of selective enforcement and prompted the court to order discovery of police policies and traffic stop records. Kennedy. 247 N.J.Super. at 23 and 27. Despite finding some “shortcomings in the data,” the court nevertheless ruled that the evidence was “marginally sufficient” to raise a colorable claim of selective enforcement. Kennedy, 247 N.J.Super. at 33-34. Additionally, in Soto, the defendants used statistics to demonstrate a pattern of conduct by police. Soto 324 N.J.Super. at 70. Moreover, in Partida a case in which the government put forth no evidence to rebut the accuracy and reliability of the statistics at issue, the court presumed that information provided by the moving party constituted a relevant basis of comparison. Castaneda Sheriff v. Partida, 430 U.S. 482, 489 (1977).
A review of the case law demonstrates that the courts are more apt to accept statistics as evidence of invidious discrimination when the variables are objective; the variables are few in number; the statistics relate to a small number of entities; the sample focuses on decisions made by individuals rather than on decisions made by departments or branches of government; the decision maker has an opportunity to explain the statistical disparity; and the court is in a position to assess both the credibility of the data and the decision maker.
In this case, the Defendant has met these criteria. First, the Defendant used objective variables, taken from traffic stop reports written by Shugrue and Pinkes. Second, the Defendant confined his calculations solely to the objective information rather than introducing his own, subjective analysis into his evi-dentiary presentation.[10] Third, unlike the moving parties in McClesky and Chavez, the Defendant makes no attempt to use general statistics to prove misconduct by a multi-department state government or even an entire department. Rather, he confines his statistical analysis to the records of the troopers who stopped and searched him. See infra at 19-20. Finally, the decision maker appeared before this Court and had an opportunity to challenge the statistical evidence or provide a race-neutral reason for the statistical disparity.
Additionally, this Court notes that the Defendant accounted for all the variables that rendered the Chavez statistical analysis unreliable. Chavez, 251 F.3d 612 at 641-44. He collected and analyzed all of Shugrue and Pinkes’ traffic stops during the relevant time periods, cited statistics about the number of minority and non-minority drivers as compared to the total number of drivers stopped by the troopers; and he based his analysis on mandatory, rather than discretionary, police reports. Chavez, 251 F.3d at 641-44. Accordingly, this Court presumes the statistics are a relevant basis of comparison and finds that the Defendant has successfully raised an inference of purposeful discrimination, or a prima facie showing of discrimination.
Once the defendant demonstrates a prima facie showing of discrimination, the government must be given the opportunity to rebut the inference. Soto, 324 N.J.Super. at 84. The government, however, cannot do so by pointing out flaws. Id. Rather, it must introduce evidence that provides a race-neutral explanation for the statistical disparities or explain a compelling government interest in treating members of one race differently from another. Soto, 324 N.J.Super. at 84; Avery, 137 F.3d at 356. No race neutral explanation was proffered to this Court by the Commonwealth.
In Todd v. Commissioner of Correction, the court refused to grant summary judgment for the Department of Correction (“DOC”) in a case in which the plaintiff claimed the DOC’s disciplinary detention sentences were disproportionately meted out to male prisoners. 54 Mass.App.Ct. 31, 40 (2002). The court *723 held that the commissioner’s affidavit, which stated that male prisoners are more violent and therefore more apt to commit offenses worthy of disciplinary punishment, was insufficient because it amounted to mere conjecture and was unsupported by objective facts. Id. at 39-40. Similarly, in Partida, a case in which the government presented no evidence to either attack the respondent’s allegations of discrimination or to challenge the reliability of the statistics, the court presumed the statistical evidence reliable. Partida, 430 U.S. at 489.
This Court finds that the record before this Court leaves no reasonable conclusion but that Shugrue stopped the motor vehicle in which the Defendant was a passenger because of the race of the operator and the race of the Defendant. Accordingly, this Court holds that the Defendant has raised an inference of purposeful discrimination, which has not been rebutted by the Commonwealth. The Defendant has substantiated his burden of proof both by a preponderance of the evidence as well as clear and convincing proof. Therefore, this Court concludes that Trooper Shugrue violated the Defendant’s rights pursuant to the Fourteenth Amendment to the United States Constitution and Articles 1 and 10 of the Massachusetts Declaration of Rights when he stopped and searched his vehicle on February 20, 2001. All evidence seized during the course of the search and seizure is suppressed.
Statements of the Defendant
The operator of the motor vehicle was stopped. After the series of events set forth above, the Defendant was placed under arrest for trafficking. Pinkes transported the Defendant to the State Police barracks immediately for booking and questioning. It was approximately a fifteen minute ride back to the barracks. There, Pinkes was seated. The Defendant was standing. The Defendant did not speak English. There was no interpreter at the barracks. The Defendant was not given a Miranda card or a sheet with Miranda Rights, either in English or Spanish to read. There is no evidence of any attempt by Pinkes to try to administer Miranda rights other than through an interpreter. Pinkes obtained the assistance of an AT&T language telephone operator, unknown to him, but who is identified only as operator 55,5509. The operator was a language assistance operator in Spanish. It obviously took a few minutes to set up the booking area and arrange to connect to the AT&T language assistance operator. The telephone used was a speaker phone. Pinkes undertook the booking procedure and stated the Miranda rights to the operator, who translated them to the Defendant.[11] After acknowledging his rights, and indicating to Pinkes that he waived them, he was asked by Pinkes how he came onto the drugs. Among other things, the Defendant responded that he bought them in the Bronx, New York for $26,900.00; that he was going to sell them for $30,000.00 and keep $4,000.00; and that the driver of the motor vehicle knew nothing about the drugs.
In analyzing whether a defendant’s statements were given in compliance with Miranda, two initial questions must be answered. First, whether the requirements of Miranda warnings were “scrupulously observed” by the police, and second, whether the defendant voluntarily waived his Miranda rights. Commonwealth v. Garcia, 379 Mass. 422, 427-28 (1980). Then the court must separately assess whether the subsequent statements were voluntarily given by the defendant. Id. Miranda requires that the police give the defendant his rights in a language which he can comprehend and on which he can knowingly act. Commonwealth v. Vuthy Seng, 436 Mass. 573, 544 (2002). A Miranda waiver is only valid if it is made knowingly, intelligently, and voluntarily. Commonwealth v. Selby, 420 Mass. 656, 660 (1995). In determining the sufficiency of the waiver, the court must consider the totality of the circumstances. Commonwealth v. Edwards, 420 Mass. 666, 670 (1995). Factors relevant to the analysis include but are not limited to the defendant’s age and experience, emotional stability, educational background, and intelligence, as well as the circumstances of the interrogation and the conduct of law enforcement interrogators. Commonwealth v. St. Peter, 48 Mass.App.Ct. 517, 520 (2000). Once a defendant has introduced evidence that a waiver of Miranda rights was invalid the Commonwealth bears the burden of proving validity beyond a reasonable doubt. Commonwealth v. Magee, 423 Mass. 381, 386 (1996). In assessing whether or not a defendant validly waived Miranda, the court may evaluate and rely upon testimony provided by the arresting officer. Commonwealth v. Scoff, 430 Mass. 351, 355-56 (1999).
Although closely related to whether Miranda was properly waived, due process requires a separate analysis of the voluntariness of the defendant’s statements. Magee, 423 Mass. at 387. A voluntary statement is one that is the product of “ ‘rational intellect’ and a ‘free will.’ ” Selby, 420 Mass at 662, quoting Commonwealth v. Davis, 403 Mass. 575, 581 (1988). A confession can be voluntary only if the defendant actually understands each Miranda warning. Garcia 379 Mass. 422 (1980). In making the determination of the voluntariness of the statement the court also looks to the “totality of the circumstances” including the circumstances surrounding the interrogation and the individual characteristics of the defendant. Selby, 420 Mass. at 663. The Commonwealth bears the additional burden of proving that the defendant’s statements are voluntary beyond a reasonable doubt. Commonwealth v. Mandile, 397 Mass. 410, 413 (1986).
During the course of the stop, Shugrue determined that the Defendant did not speak much English and provided an AT&T language assistance operator to *724 interpret for him at the state police barracks. On the surface, the assistance of the interpreter appears to be an adequate manner in which to inform the Defendant of his Miranda rights and to obtain both waiver and the statements. See Vuthy Seng, 436 Mass. at 544, Commonwealth v. Ardon, 428 Mass. 496, 499 (1998) (held interpreter need not he independent). However, given the totality of the circumstances regarding the giving of Miranda rights in this circumstance, this Court is unable to find that the Commonwealth has met its burden of proving, beyond a reasonable doubt, that the Miranda requirements were scrupulously observed or intelligently and voluntarily waived. In Vuthy Seng, the court held that the Commonwealth’s evidence of incomplete Miranda rights given to the defendant in his native language, followed by complete Miranda rights in English, of which the defendant did have basic understanding, did not meet the Commonwealth’s “heavy” burden of demonstrating that the defendant was advised of his rights in a way in which he could understand. Vuthy Seng, 436 Mass. at 544. In Vuthy Seng, the court was able to evaluate the accuracy of the Miranda rights given in a foreign language. In the present case, this Court is unable to do so. While the court knows that the defendant did not speak English, the person who translated the Miranda rights is unknown except by number, was not actually present at the police station, and possesses capabilities for translating Spanish to English, and vice versa which are unknown. Pinkes testified only that Miranda rights were given without enumerating what they were. Moreover, Pinkes offered only a conclusory statement that the Defendant was given and understood and waived his rights without knowing exactly what rights he was given or what the responses of the Defendant were. The totality of these circumstances does not allow this Court to conclude that the defendant was properly advised of his rights, that he understood those rights, and that he waived those rights, all beyond a reasonable doubt As the basis for giving a voluntary statement is an understanding of Miranda rights and intelligent and voluntary waiver of those rights, this Court is also unable to find that the Commonwealth has met its burden of proving, beyond a reasonable doubt, that the defendant’s statements were voluntary.
However, if it is ever determined that his statements are admissible as not in violation of Miranda, the issue remains as to whether the statements of the Defendant should be suppressed as the fruit of the prior arrest which this Court has determined to be illegal because based upon race, or in other words, an illegal arrest. Fruits of an illegal arrest must be suppressed. Commonwealth v. Bottari, 395 Mass. 777, 785 (1985).[12] The Commonwealth has the burden of proving that the statements subsequent to an illegal arrest are untainted by that arrest. Commonwealth v. Fredette, 396 Mass. 455, 459 (1985). The giving of adequate Miranda warnings alone is insufficient to remove the taint of illegality. Commonwealth v. Bradshaw, 385 Mass. 244, 258 (1982). There are only three exceptions that remove the taint of the poisonous tree doctrine; where the government obtained the alleged fruits through an independent source, where the connection between the illegal arrest and derivative evidence has become so attenuated as to dissipate the taint of illegality, or where the evidence was the product of inevitable discovery. Fredette, 396 Mass. at 459. As there is no argument that the Defendant’s statements in the barracks were obtained through an independent source or “inevitable discovery,” this Court need only analyze whether the circumstances between the illegal arrest and the Defendant’s statements were sufficiently attenuated to remove the taint of the arrest.
In determining attenuation there are three factors to consider: (1) the amount of time between the illegality and the giving of the statement; (2) the presence of intervening factors; and (3) the purpose and the flagrancy of the official misconduct. Commonwealth v. Borges, 395 Mass. 788, 796 (1985) citing Brown v. Illinois, 422 U.S. 590, 603-04 (1975).
(1) The time between the illegality and the giving of the statement: The barracks was only twelve miles, or approximately fifteen minutes from the scene of the arrest. The court has found that a confession one and a half (IVy hours after an illegal arrest was sufficient temporal attenuation to dissipate the taint of the illegal arrest and therefore deny the defendant’s motion to suppress. Commonwealth v. Sylvia, 380 Mass. 180, 184-85 (1980). However, the Defendant’s statements occurred upon arrival at the State Police barracks, which as mentioned before was only a short distance from the arrest site. Although there were undoubtedly several minutes which elapsed by the time the operator was connected, there is no evidence that the Defendant was booked first, and this Court finds that he was not booked until after the telephone interview. This Court concludes that the Defendant was questioned immediately upon being transported to the barracks, which did not allow for sufficient time to dissipate the taint of the illegal arrest.
(2) The presence of intervening factors: If intervening factors are present which serve to break the chain between the illegal arrest and the subsequent statements the defendant’s motion to suppress should be denied. Fredette, 396 Mass. at 460. In Commonwealth v. Maldonado, the Appeals Court denied the defendant’s motion to suppress a gun seized after an unlawful pretextual traffic stop. 55 Mass.App.Ct. 450 (2002). The defendant had been told that his car was to be towed, upon which time he returned to his car and retrieved the gun. Id. at. 452-53 The court held that this was an independent voluntary act by the defendant that was an intervening factor. Id. at 454. It was this intervening factor and not the original unlawful stop that led to the discovery of the gun. Id. This Court finds that there are no such intervening *725 factors to be considered other than the fact that an AT&T language assisted operator helped in the translation of the Miranda rights, and the statement given by the Defendant although there is no evidence before this Court as to the specific rights which were given and whether they were complete.
(3) The purpose and the flagrancy of the official misconduct: Even if the time is short and there are no intervening factors the court may find that the confession is not fruit of the illegal arrest if there is no flagrant misconduct by the police. Commonwealth v. Manning, 44 Mass.App.Ct. 695, 699 (1998). In Manning the court denied the defendant’s motion to suppress a photograph taken on the date of his illegal arrest. Id. at 698-99. Although the photo, which was used to identify the defendant in relation to a separate crime, was taken shortly after the arrest and there were no intervening factors to consider, the court found that the absolute absence of misconduct by the police warranted a finding that the suppression was inappropriate. Id. at 699. Unlike Manning, in the present case, in addition to a short time span between the Defendant’s illegal arrest and the statements and no intervening causes, there is also evidence of flagrant misconduct by the police. Deterrence of police misconduct is precisely why the court excludes evidence obtained through illegal arrests. The Troopers had stopped a motor vehicle the search of which yielded a kilo of cocaine. This Court previously found that the stop was race based. The Defendant passenger was under arrest. He spoke little English and needed the assistance of an interpreter. Miranda rights were administered through an AT&T language assistance operator whose identity is unknown except by number 55,5509. The precise Miranda rights given to the Defendant are unknown. No rights in the form of a card or sheet of paper, in either English or Spanish, were given to the Defendant. By law, mere presence in the same automobile alone may not be sufficient to convict; and a statement tying in either or both of the occupants of the motor vehicle would certainly simplify a problematic trafficking case.
This Court finds that the statement of the Defendant was obtained by the exploitation of the illegal arrest and should therefore be suppressed.
ORDER
The Defendant’s Motion to Suppress is ALLOWED as to the evidence seized by the State Police on the grounds that the stop was a race based stop.
The Defendant’s Motion to Suppress is ALLOWED as to the statements of the Defendant on the basis of Miranda violations and as “fruits of the poisonous tree.”
Therefore, the Motion to Suppress is ALLOWED in its entirety as to all evidence seized and any statements given by the Defendant.

 Although the Defendant did not raise the Equal Protection Clause on the face of his Motion to Suppress, he does raise the Equal Protection Clause and discuss it in his memorandum in support of the motion. Therefore, the issue is properly before the Court for consideration.

M.G.L.A 89 §4B: Driving in lane nearest right side of way
Upon all ways the driver of a vehicle shall drive in the lane nearest the right side of the way when such lane is available for travel, except when overtaking another vehicle or when preparing for a left turn . . .
720 CMR 9.06: Operation of Vehicles
(2) Use Right Lane. Upon all roadways the driver of a vehicle shall drive in the lane nearest the right side of the roadway when said lane is available for travel, except when overtaking another vehicle or when preparing for a left turn.

M.G.L.A. 90 §22G: Littering
The registrar may, after due hearing, suspend for a period not exceeding seven days the license or permit to operate motor vehicles or the right of a person to operate motor vehicles in the commonwealth of any person who litters, or who knowingly permits, as the operator, occupants of his vehicle to litter, public or private property through the disposal of trash or garbage from said motor vehicle.
M.G.L.A. 270 §16: Disposal of rubbish, etc. on or near highways and coastal or inland waters; penalties; enforcement; park rangers
Whoever places, throws, deposits, discharges, or causes to be placed, thrown, deposited or discharged, any trash . . . refuse, . . . debris, . . . waste or any other material of any kind on a public highway . . . shall be punished by a fine . . .

There is no evidence presented to the court that Pinkes actually issued a citation to the operator of the motor vehicle for this alleged violation.

The Commonwealth did move to strike, but only after both sides rested and not before.

M.G.L.A. 89 §4B: Driving in lane nearest right side of way
Upon all ways the driver of a vehicle shall drive in the lane nearest the right side of the way when such lane is available for travel, except when overtaking another vehicle or when preparing for a left turn . . .
720 CMR 9.06: Operation of vehicles
(2) Use Right Lane. Upon all roadways the driver of a vehicle shall drive in the lane nearest the right side of the roadway when said lane is available for travel, except when overtaking another vehicle or when preparing for a left turn.

Perhaps the characterization of this phenomenon would be “DWM” or “driving while minority.”

In Gonsalves the Supreme Judicial Court refused to adopt the federal rule that an officer may automatically order a suspect out of a vehicle during a traffic stop. 429 Mass. at 665-66. The Court held that Article 14 of the Massachusetts Declaration of Rights provides individuals with greater protection than the Fourth Amendment to the United States Constitution and requires that police have a legitimate personal or public safety concern before ordering a suspect out of the vehicle. Id.

The court also noted that something is considered statistically significant if it would occur by chance fewer than five times in one hundred Soto, 324 N.J.Super. at 71.

The Court refused to consider the Defendant’s subjective analysis of twenty traffic stops he deemed to be “similar to his own.” Such an analysis places too much discretion in the hands of the individual conducting it and are not reliable. See infra at 6-7.

here is no evidence presented to the Court as to what rights were actually read to the AT&T operator, only that they were “Miranda!' rights, which is conclusory.

In Commonwealth v. Marquez the court held that when an arrest is illegal, but the police nonetheless had probable cause to arrest the defendant the taint of the illegal arrest flows only to physical evidence seized in a search incident to the arrest not to any post arrest statements. 434 Mass. 370, 377-79 (2001). In Marquez, the police made an illegal warrantless arrest in the defendant’s own home, but did possess sufficient probable cause to make the arrest. Marquez is inapplicable to the current case as Pinkes did not have probable cause, for reasons previously stated, to stop and arrest the Defendant.