Agnes, A.J.
I. INTRODUCTION
The defendant Efrain Sanchez is charged by indictment with trafficking in heroin in violation of G.L.c. 94C, §32E(B) based on the seizure of more than 5,000 individually wrapped glassine packages containing heroin with a total net weight of more than 250 grams and a street value estimated to be more than $ 100,000 from his vehicle on November 19, 2002. According to the Grand Jury testimony of State Police Trooper Walsh, the seizure resulted from a motor vehicle stop. The defendant was the operator and sole occupant. According to Trooper Walsh, the defendant’s vehicle was stopped on Interstate Route 84 because it was speeding. The defendant was placed under arrest when the trooper discovered that the defendant’s license had been suspended by the Registrar of Motor Vehicles. Based on what is described as an inventory search of the defendant’s vehicle, the State Police discovered a sealed package in the back seat area containing the heroin packets surrounded by coffee grounds.
II. BACKGROUND
The defendant filed a discovery motion requesting copies of the “citation history” of two state police troopers (Trooper Walsh and Trooper Berteletti) during the period January to December 2002. The defendant based the motion on some legal authorities but did not submit an affidavit. That motion was denied by the Court (Fahey, J.) on grounds that it did not comply with Mass.R.Crim.P. 14(a)(2) which conditions allowance of a motion for discretionary discovery on an adequate affidavit under Mass.R.Crim.P. 13.
The defendant has filed a motion for reconsideration of his first motion for discovery. His motion is accompanied by several affidavits. According to the affidavit by Abdo AM, a certified auto mechanic, he examined and, by means of an “Auto-Calibrating Tint Meter,” he tested the windows of the vehicle the defendant was operating when he was stopped by trooper Walsh, and found that the tint was within legal limits, This is significant, he says, because Trooper Walsh reported that the windows of the defendant’s vehicle were tinted and that this factor prevented him discovering the race or ethnicity of the operator until after the motor vehicle stop. However, in an affidavit submitted by the Commonwealth in opposition to the defendant’s motion for reconsideration, Trooper Walsh states that he stopped the defendant’s vehicle at 2:00 p.m. on November 19, 2002 when he observed it traveling at a speed estimated to be in excess of 70 m.p.h. ahead of his police cruiser which was traveling in the outside third lane on the eastbound side of Interstate Route 84. Trooper Walsh also states that “[t]he vehicle appeared to have excessive window tint, which prevented me from seeing inside the vehicle.” He also states “at no time prior to the stop did I have any idea of the driver’s race or ethnicity.” He adds that subsequently, Trooper Berteletti measured the tint and found it to be within legal limits.
The defendant also relies on an affidavit from his attorney, John Bosk who states that as a board member of the Worcester County American Civil Liberties Union, he has received over 40 complaints in the last ten years from “Hispanics” reporting illegal acts of “racial profiling” by the Massachusetts State Police. Attorney Bosk further states that on three occasions he has been called by clients (names not provided) who have been stopped by the Massachusetts State Police, and that he has heard over their cell phones portions of conversations in which State Police troopers made remarks that he believes are consistent with stops resulting from racial profiling. Attorney Bosk also adds that in another case in this court involving the Massachusetts State Police, but which does not involve defendant Sanchez or any of the troopers involved in the present case, racial profiling has been found to exist in Worcester County. Finally, he notes that his observations of the defendant’s vehicle suggest its windows have only a “mild tint,” that he was able to “clearly see the features of someone sitting in the driver’s seat on a grey, overcast day,” and that the defendant Sanchez told him he (the defendant) was not speeding and that his vehicle’s windows are not illegally tinted.
*290 III. DISCUSSION
A.
Unlawful racial and gender profiling by law enforcement personnel is a national problem. The problem has been recognized and addressed in Massachusetts. In Commonwealth v. Gonsalves, 429 Mass. 658, 670-71 (1999), in a concurring opinion, Justice Ireland, expressed a concern that federal law, which allows the police to issue exit orders to the occupants of a motor vehicle during any traffic stop, could be a “clear invitation to discriminatory enforcement.” Based on the majority opinion written by Justice Greaney, Article 14 of the Massachusetts Declaration of Rights provides some protection against discriminatory enforcement in traffic stops because it forbids the police from ordering people out of automobiles without some justification.
The Massachusetts Legislature also has taken an initiative to suppress unlawful profiling in traffic stops by enacting St. 2000, c. 228, §8 (effective April 1, 2001). This statute defines “racial and gender profiling” as “the practice of detaining a suspect based on a broad set of criteria which casts suspicion on an entire class of people without any individualized suspicion of the particular person being stopped.” St. 2000, c. 228, §8, Section 1. The statute charges the Executive office of Public Safety (EOPS) to work with state and local police “to identify and eliminate any instances of racial and gender profiling by police officers in the performance of their official duties.” St. 2000, c. 228, §8, Section 2. In a further effort to eradicate the practice of illegal profiling, the legislature required a number of specific initiatives including (1) the development of a Model Policy and Procedure for police departments, (2) a mandate that the topic of unlawful profiling be included in the curriculum of basic and advanced police training programs, (3) a mandate to EOPS to undertake a public awareness campaign, (4) a mandate to the Registry of Motor Vehicles to revise the Uniform Motor Vehicle Citation form to gather additional data about the characteristics of persons subject to motor vehicle stops and a uniform protocol to guide police officers in how to use the new form to record the race and sex of each person stopped, (5) a mandate to the Registry of Motor Vehicles to revise the driver education manual to provide additional information to motorists about unlawful profiling, (6) a mandate to the Registiy of Motor Vehicles to collect and process statistical data about motor vehicle stops including the race and gender of every person who receives a citation or warning, and (7) a mandate to the Registiy of Motor Vehicles to transmit such statistical data to EOPS each month. St. 2000, c. 228, §8, Sections 3, 4, 5, 6, 7 and 8. The legislature directed EOPS to transmit the data it receives on the characteristics of persons subject to motor vehicle stops to a university in Massachusetts for an analysis and a report of its findings. St. 2000, c. 228, §8, Section 10. If the state or any local police department is found to be engaging in racial or gender profiling, EOPS, in consultation with the Attorney General, must order the offending agency to collect data on every motor vehicle stop for a one-year period. St. 2000, c. 228, §8, Section 10.
Since the passage of the law, a number of these steps have been carried out. On March 15, 2001, the Secretary of EOPS sent a letter to all police chiefs and other law enforcement personnel explaining the new law and its requirements. A toll-free hotline for reporting abuses has been established within EOPS (“1-866-6 RACIAL”). A model police policy has been developed. See http: / / www. state.ma.us / eops/download / model_pol icy.pdf. This policy provides in part that unless an officer is engaged in a suspect-specific incident, “police officers are prohibited from considering race, gender, national or ethnic origin of members of the public in deciding to detain a person or stop a motor vehicle and in deciding upon the scope or substance of any law enforcement action.” Model Policy, Section IV. There is a new protocol for the Use of the Massachusetts Uniform Citation which explains the responsibility of the Registry of Motor vehicles for data collection and the use of six new categories to record the race of each person stopped and issued a warning or citation. The protocol informs officers that the original citation’s provision for recording a driver’s sex has been retained. The new categories are “A” [Asian or Pacific Islander], “B” [Black], “H” [Hispanic], “I” [American Indian or Alaskan Nativel, “M” [Middle Eastern or East Indian] and “W” [White]. The protocol directs officers not to ask motorists to identify their race, but to make that judgment “based on their observations, training and experience.” It requires that officers enter one and only one “race” per subject. Officers also must record whether any non-inventory search was carried out at the time the citation was issued. The protocol also requires officers to record more data about the location of the offense so that “the demographics of a particular area (i.e., local and driving population) are appropriately considered in data analysis. See http://www.state.ma.us/eops/download/citation_p rotocol.pdf.
Earlier this month, the Institute on Race and Justice of Northeastern University released a draft report of preliminary results of its analysis of citation data collected by the registiy of Motor vehicles between April 1, 2001 and June 30, 2003. See Massachusetts Racial and Gender Profiling Project Preliminary Tabulations (January 20, 2004) (Northeastern University Institute on Race and Justice) (“Preliminary Report”), found at http://www.northeastern.edu/whatsnew.html. According to this data, in some communities there is a significant disparity between the percentage of minority drivers who received citations and the percentage of minority drivers in the community,[1] as well as a disparity between the percentage of ticketed non-white drivers who are *291 searched compared to the percentage of ticketed nonwhite drivers who are searched.[2] The study cautions that while the preliminary data may indicate patterns of disparate traffic citation activity, it does not support a conclusion that any police department in Massachusetts has engaged in racial profiling. Preliminaiy Report at 1. Among other things, the preliminary study notes that one of its limitations is that the Massachusetts legislation only deals with traffic stops for which a citation is issued. Preliminary report at 4.[3] Also, due to funding limitations, the study indicates that only a sample of cases involving a written warning as opposed to a citation was computerized and an analysis of this data will not appear until the final report is issued.
B.
The question in the case before the court is not whether the evidence sought is exculpatory (although there certainly has been no showing to that effect by the defendant)[4] but whether the information in question is subject to a discovery order under Mass.R.Crim.P. 14. For purposes of this discussion, it is assumed that the defendant has met the threshold requirement of establishing the relevance of the citation material he seeks. See Commonwealth v. Oliveira, 428 Mass. 325 (2002). See note 4 supra. In adopting St. 2000, c. 228, §8, Section 9, the legislature specifically provided that “individual data acquired under this section shall be used only for statistical purposes and may not contain information that may reveal the identity of any individual who is stopped or any law enforcement officer.” Putting aside the precise contours of this restriction on access to these records, it is plain that the data sought by the defendant is not a public record. “(I]f a defendant wants information not available as a public record, ‘such discovery should follow normal procedures in criminal cases where its availability lies in the discretion of the trial judge under standards developed by this court.’ ” Commonwealth v. Wanis, 426 Mass. 639, 643 (1998), quoting Bougas v. Chief of Police of Lexington, 371 Mass. 59, 64 (1976).
Commonwealth v. Wanis, supra, rests on the distinction between the scope of a discretionary discovery order against the Commonwealth under Mass.R.Crim.P. 14 and the scope of a summons directed against a third party right provided for in Mass.R.Crim.P. 17. As the Court noted in Commonwealth v. Rodriguez, 426 Mass. 647, 648 (1998), “(I]n our Wanis opinion, we held that (1) material exempted from disclosure pursuant to the public records law is not automatically privileged from discovery if a criminal defendant moves for its production; (2) a prosecutor who does not have access to the records of an internal affairs division is not properly subject to a motion under Mass.R.Crim.P. 14 for the production of these records; (3) a pretrial motion may be filed under Mass.R.Crim.P. 17(a)(2) seeking a summons for the production of documents and other objects by the keeper of the records of an internal affairs division; (4) the internal affairs division can move to quash or modify such a subpoena, thereby placing before a judge the lawfulness of the command to produce and other issues, such as its reasonableness and whether, balancing policy considerations against a defendant’s right of confrontation, the subpoena should be honored, restricted or modified in some way, or quashed
Here, the records sought by the defendant are not in the custody of the prosecutor, the investigating officer or law enforcement personnel under the control of the prosecutor. See Commonwealth v. Ira I, 439 Mass. 805 (2003) (assistant school principal who had taken a statement from the juvenile was not part of the prosecution team for purposes of the scope of a discretionary criminal discovery order). The records are under the control of the Registry of Motor Vehicles and the Executive Office of Public Safety. See St. 200, c. 228, §8. Accordingly, there is no basis for a discovery order against the Commonwealth under Mass.R.Crim.P. 14.
ORDER
For the above reasons, the defendant’s motion for discretionary discovery is DENIED.

 The highest percentage differences include 42% in the town of Milton, nearly 30% in the town of Methuen and 16% in the City of Boston.

 The highest percentage differences include 10% in the town of North Adams, 5% in the city of Taunton, and 3.5% in the city of New Bedford.

 ‘The absence of data on all traffic stops limits our ability to identify racial disparities in searches. In other studies of traffic stops, it has been noted that statewide approximately one-half of the drivers stopped receive a citation. While there is much local variation in the likelihood of receiving a citation once stopped, it remains hue that many drivers are stopped and do not receive any formal citation. In addition, some drivers are also subject to searches as part of the traffic stop but no traffic citation is issued. One result of this is that in Massachusetts we do not have any information on some number of traffic stops where searches occurred but no citation was written. If these kinds of traffic stops were more likely to happen to one racial or gender group more than another we would have no information on that disparity.” Preliminary Report at 5.

 The mere fact that the records sought are potentially exculpatory does not alter the result. See Commonwealth v. Dexter, 50 Mass.App.Ct. 30 (2000) (“Where potentially exculpatory information is not in its possession or in the possession of someone subject to its control, the Commonwealth has no obligation to seek out such information for use by the defense”). Likewise, the fact that in another case, this court has found that several members of the Massachusetts State Police involved in a motor vehicle stop of an Hispanic male on February 9, 2001 on Interstate Route 290 had citation histories indicating a substantially higher rate of stops of Hispanic motorists than white motorists compared to the respective representation of their groupings in the population, see Commonwealth v. Lora, Superior Court No. 2002-0413 (Sept. 12, 2003) (McCann, J.) (16 Mass. L. Rptr. 715), is certainly significant on the question of the relevance of the data sought, but does not have any bearing on the question of whether it is discoverable under Mass.R.Crim.P. 14.