## COMMONWEALTH *VS.* LUIS MALDONADO.

No. 01-P-80.

Middlesex. May 14, 2002. - July 17, 2002.

Present: CYPHER, MASON, & KAFKER, JJ.

Further appellate review granted, 438 Mass. 1101 (2002).

*Firearms. Search and Seizure,* Threshold police inquiry, Motor vehicle, Fruits of illegal arrest. *Practice, Criminal,* Empanelment of jury, Challenge to jurors. *Habitual Offender.*

In a criminal action for unlawful possession of a firearm, the judge properly denied a pretrial motion to suppress evidence of the gun that the defendant possessed, where, although the initial stop of the vehicle in which the defendant was a passenger was illegal, the police did not obtain the evidence through exploitation of the initial illegal stop, but rather through the defendant's voluntary, intervening act of returning to the vehicle and picking up the gun. [453-454]

At a criminal trial, the prosecutor's reasons for challenging a juror were not race neutral, and this court therefore reversed the defendant's conviction. [454-458]

At the trial of an indictment charging the defendant with unlawfully possessing a firearm having been previously convicted of three violent crimes or serious drug offenses, the Commonwealth's evidence was sufficient to prove that the defendant was the same person named in two previous convictions; however, because this court concluded that the defendant's third conviction for unlawful possession of a firearm had to be reversed, this court also reversed the defendant's conviction as a career criminal due to the absence of any predicate conviction. [458-460]

INDICTMENTS found and returned in the Superior Court Department on January 14, 1999.

A pretrial motion to suppress evidence was heard by *Charles M. Grabau,* J., and the cases were tried before *Maria I. Lopez,* J.

*William Keefe* for the defendant.

*Thomas D. Ralph,* Assistant District Attorney (*Elizabeth A. Dunigan,* Assistant District Attorney, with him) for the Commonwealth.

MASON, J. A grand jury returned indictments charging the defendant with unlawfully possessing a firearm, G. L. c. 269, § 10(*a*), and with unlawfully possessing a firearm having been previously convicted of "three violent crimes or serious drug offenses," G. L. c. 269, § 10G(*c*). A jury in the Superior Court found the defendant guilty of the charge of unlawfully possessing a firearm and, following a separate bench trial, the judge found the defendant guilty of the charge of unlawfully possessing a firearm having been previously convicted of three violent crimes or serious drug offenses.

On appeal, the defendant claims that the judge erred in denying his motion to suppress the gun seized from his person following a warrantless traffic stop. He also claims that the prosecutor's peremptory challenge of the only two black jurors deprived him of his right under art. 12 of the Massachusetts Declaration of Rights to be tried by an impartial jury, and that his motion at the subsequent bench trial for a required finding of not guilty on the charge of unlawful possession of a firearm having been previously convicted of three violent crimes or serious drug offenses should have been allowed. We affirm the denial of the suppression motion. Nevertheless, because we agree that the Commonwealth misused its final peremptory challenge, we reverse both convictions.

*The suppression hearing.* The sole witnesses at the suppression hearing were police Lieutenant Edward Hussey and Officer Sean Peterson, the officers participating in the stop of the defendant. We summarize the facts as found by the motion judge.

On December 6, 1998, shortly before midnight, Lieutenant Hussey of the Cambridge police department was operating his cruiser on Windsor Street in Cambridge. He observed a red BMW automobile double-parked on the street with its motor running. Lieutenant Hussey believed that the car may have been used in a shooting incident two to three weeks earlier, and that the defendant may have been the shooter.

Lieutenant Hussey drove past the BMW and radioed the police station with the BMW's license plate number. He was informed that the vehicle was registered to the defendant's wife. He then asked for a check on the licenses of the defendant and

his wife and was told that the defendant's license had been suspended or revoked, but that his wife's license was current.

After receiving this information, Lieutenant Hussey returned to the location on Windsor Street where the BMW had been parked. As he was doing so, the BMW pulled away from the curb, proceeded up Windsor Street at about forty to forty-five miles per hour, and then turned left onto Massachusetts Avenue. Lieutenant Hussey lost sight of the car at this time.

About an hour and a half later, however, Lieutenant Hussey saw the BMW again, this time parked on Massachusetts Avenue. There were two occupants seated in the front seat of the car. As Lieutenant Hussey drove by the car, the car again pulled away from the curb and proceeded up Massachusetts Avenue. This time, Lieutenant Hussey followed and stopped the car. As he was doing so, Lieutenant Hussey observed that the occupant of the front passenger seat of the car, who was later identified as the defendant, "kept moving up and down, bent over at one point, and continuously moved until the car pulled to the curb."

Lieutenant Hussey approached the operator's side of the car and asked the driver, who was later identified as Arnaldo Burgos, for his license and registration. He returned to his cruiser, asked for a license check, and was told that Burgos's license had been suspended. Lieutenant Hussey then asked Burgos to exit the car and he also asked the defendant to state his name. The defendant did so and also stated that the car belonged to his wife.

Lieutenant Hussey then returned to his cruiser and requested assistance. After several other officers had arrived, Lieutenant Hussey placed Burgos under arrest for driving the car without a license and asked the defendant to exit the car. Lieutenant Hussey frisked the defendant and found a small knife in his pants pocket. He also looked under the seats and in the glove compartment of the car, but found nothing further.

Following the search, Lieutenant Hussey told the defendant that he intended to have the car towed. The defendant asked if he could call his wife and ask her to pick the car up. Lieutenant Hussey agreed to this request and told the defendant to use a nearby pay phone to call his wife.

Instead of doing so, however, the defendant reentered the car.

At this time, Officer Peterson, one of the officers providing assistance, observed the defendant sitting in the car and asked Lieutenant Hussey whether it was permissible for the defendant to be doing so. When Lieutenant Hussey responded that the defendant should not be in the car, Officer Peterson returned to the car and saw the defendant "fidgeting" within the car. He then took out his flashlight and saw what appeared to be a gun in the defendant's lap. At this point, Officer Peterson moved closer and saw that the object was in fact a gun. He immediately yelled "gun," and pulled the defendant out of the car. The defendant was arrested for unlawful possession of a firearm.

1. *Suppression issues.* In ruling on the defendant's suppression motion, the judge first rejected as not credible Lieutenant Hussey's testimony at the suppression hearing that he had stopped the car in which the defendant was riding because he believed that the defendant, rather than Burgos, was driving the car. The judge found instead that the officer had stopped the car in the hope of turning up evidence pertaining to the shooting which occurred two or three weeks earlier. The judge nevertheless concluded that the unlawful stop and search did not require suppression of the gun under the fruit of the poisonous tree doctrine, see *Wong Sun* v. *United States*, 371 U.S. 471, 488 (1963), because the defendant's actions of returning to the car and obtaining the gun following the stop and search had created "a completely new situation so attenuated from the initial encounter as to dissipate wholly whatever initial taint" occurred. *Commonwealth* v. *Holmes*, 34 Mass. App. Ct. 916, 918 (1993).

The defendant claims that the judge's conclusion was erroneous and that his action of returning to the car and obtaining the gun did not dissipate the taint of the initial unlawful stop for purposes of determining whether the gun was required to be suppressed under the fruit of the poisonous tree doctrine. Citing *Commonwealth* v. *Manning*, 44 Mass. App. Ct. 695, 699-700 (1998), the defendant notes particularly that, as found by the judge, the initial stop was a pretext, rather than a good faith mistake as to the existence of a sufficient reasonable suspicion to justify the stop.

In *Manning*, we noted that "[i]t is well established that if the illegal arrest was for investigatory purposes, solely to acquire

data regarding the defendant, the evidence [obtained as a result of the arrest] should be suppressed." *Commonwealth* v. *Manning, supra* at 699. In that case, however, there were no intervening circumstances or events between the initial unlawful arrest of the defendant and the obtaining of the evidence sought to be suppressed. Rather, the defendant sought suppression of a booking photograph and an identification made from that photograph which were obtained as a direct result of the defendant's unlawful arrest. *Ibid.*

Here, by contrast, the police had completed their stop and accompanying search of the defendant before the gun was discovered, and had told the defendant that he was free to leave the area to call his wife and arrange for her to pick up the car. Rather than doing so, however, the defendant returned to the car and picked up the gun. It was only this intervening act by the defendant, which itself constituted the crime of unlawfully possessing a firearm, which caused the gun to be discovered.

In view of these circumstances, we agree with the judge that the police did not obtain the gun by exploiting their initial unlawful stop. Rather, the police obtained the gun only as a result of the defendant's voluntary, intervening act of returning to the car and picking up the gun. The defendant's suppression motion was therefore properly denied. See *Commonwealth* v. *Saia,* 372 Mass. 53, 57-58 (1977); *Commonwealth* v. *Fredette,* 396 Mass. 455, 458-459 (1985); *Commonwealth* v. *Holmes, supra* at 918. See also *Wong Sun* v. *United States, supra* at 491; LaFave, Search and Seizure § 11.4(a), at 234-235, and § 11.4(j), at 337-340 (3d ed. 1996).

2. *Allowance of peremptory challenge.* After fourteen prospective jurors had been seated in the jury box, the prosecutor exercised a peremptory challenge to remove the only black juror, who also was a Superior Court judge. After a replacement was seated, defense counsel exercised peremptory challenges to remove the replacement and two other jurors. After replacements for those three jurors were seated, the prosecutor exercised two additional peremptory challenges to remove two of those replacements. Finally, after replacements for those jurors were seated, the prosecutor exercised her last peremptory challenge to remove one of those replacements, juror 9-8. That juror was black.

At this point, the following exchange occurred between the judge and the prosecutor:

PROSECUTOR: "I would use my last challenge on [juror 9-8]."

THE JUDGE: "Why?"

PROSECUTOR: "Why would I?"

. . .

THE JUDGE: "Yes. I am inquiring. He is the only black guy. I can understand [the judge], but then we have a minority defendant, and then we've got the only black potential juror. So I need a reason."

PROSECUTOR: "I would put forth two reasons. First of all, I would submit that he doesn't have any children. He's single all his life. I have a young police officer who just started in the job. I'm a young D.A. He might not find my witness as experienced as an older person — not having any children — starting out in the field. Secondly, I would note that the defendant is certainly entitled to a jury of his peers, a cross-section; but he's not entitled to have someone of his race in the jury box. I think it's from a proper cross-section. So I would put — on the record, I would put forth those two reasons."

THE JUDGE: "One is that he's single and never had children? Now, we have a lot of jurors there that are single and do not have children."

PROSECUTOR: "Not children, young."

THE JUDGE: "That are young?"

PROSECUTOR: "Yes."

THE JUDGE: "What difference does that make?"

PROSECUTOR: "Well, I mean, it's like anything. I mean, there was a minister up there who I thought would do the righteous thing, but he also had an earring in. You know, I mean, there's many ways of just looking at the jurors, too.

And I think the fact that he doesn't have any kids, and he's fifty-five years old — I have a young — I'm a young D.A. I have a young witness, which is the only one that saw the gun in the lap. That's the reason that I would excuse him. It's just a feeling. That's why I used my peremptory. I mean, it's not because of his color. It's certainly not that."

The judge then excused juror 9-8, and defense counsel noted an objection.

The defendant claims that the judge failed to follow the procedural requirements set forth in *Commonwealth* v. *Burnett*, 418 Mass. 769, 770-771 (1994), for determining whether there is a bona fide race-neutral explanation for a peremptory challenge when there is a likelihood that a juror is being excluded by reason of the juror's membership in a protected group. Specifically, the defendant claims that, before allowing the prosecutor's peremptory challenge of juror 9-8, the judge should have made an explicit finding that the reasons the prosecutor had articulated for the challenge were bona fide, rather than a pretext.

We agree with the defendant that, before allowing the prosecutor's peremptory challenge of juror 9-8, the judge should have made an explicit finding that the reasons the prosecutor had articulated for the challenge were bona fide, rather than a pretext, and explained the basis for her finding. By requiring the prosecutor to explain the reasons for her challenge, the judge implicitly found that the challenge might be improper.[1] See *Commonwealth* v. *Calderon*, 431 Mass. 21, 25-26 (2000), and cases cited. The judge was therefore "required to make an independent evaluation of the prosecutor's reasons and to determine specifically whether the explanation was bona fide or a pretext." *Id.* at 26. "This latter step involves more than a rub-

---

[1]Although the record before us does not conclusively establish the defendant's race or color, the prosecutor referred to him as a "person of color," and the judge referred to him as a "minority defendant." Both parties appear to assume on appeal that the defendant is black. It also appears from the record that the prosecutor used her peremptory challenges against the only two members of the jury venire who were black. The judge's implied finding of a prima facie case of improper challenge therefore appears warranted. See *Commonwealth* v. *Harris*, 409 Mass. 461, 465 (1991), and cases cited.

ber stamping of the proferred reasons; it requires a meaningful consideration whether the challenge has a substantive basis or is impermissibly linked to race." *Ibid.* See *Commonwealth* v. *Garrey,* 436 Mass. 422, 430 (2002).

Nevertheless, procedural error in ruling on peremptory challenges is not a per se ground for reversal. *Commonwealth* v. *Calderon, supra* at 27. Rather, it requires us to make our own determination whether the prosecutor's reasons for the challenge were race-neutral, giving no deference to the judge's ruling. *Id.* at 27-28. See *Commonwealth* v. *Rivera,* 50 Mass. App. Ct. 532, 536 (2000). In the circumstances of this case, we conclude that they were not.

First, there is no apparent reason, and the Commonwealth has suggested none, why a fifty-five year old person who had never had any children would be less inclined to believe the testimony of the police officers in this case than persons of similar age who then had young children. The prosecutor implicitly conceded as much when she stated at the end of her colloquy with the judge that her challenge was based on nothing more than a "feeling," such as the one she had when she had previously challenged a minister who had "an earring in." This is the type of vague, subjective assertion which repeatedly has been held insufficient to rebut a prima facie case of improper juror selection. See, e.g., *Commonwealth* v. *Rodriguez,* 431 Mass. 804, 809 (2000) (rejecting defense counsel's explanation that he did not like juror's "looks"); *Commonwealth* v. *Botticelli,* 51 Mass. App. Ct. 802, 809-810 (2001) (rejecting explanations that one juror had a "stern appearance," and that another "might identify with the victim").

Moreover, the jury questionnaires preserved as part of the record in this case[2] show that, among the jurors initially seated and never challenged by the prosecutor, was a woman (juror 13-4) who was forty-seven years old and had no children, and a man (juror 11-2) who was sixty-six years old and had four adult offspring who were aged forty-four, forty-three, thirty-nine, and thirty-seven, respectively. The thirty-seven year old had been

---

[2]That the defendant failed to include these questionnaires in the appendix to his brief does not preclude us from relying on them. See Mass.R.A.P. 18(a), as amended, 378 Mass. 940 (1979).

incarcerated for six months and was then on parole. There is no apparent reason why, if the prosecutor were truly concerned about having older people, or older people without young children, on the jury, she would not have challenged one or both of these other jurors.

We therefore conclude that the prosecutor's reasons for the challenge at issue were not race-neutral. See *Commonwealth v. Burnett*, 36 Mass. App. Ct. 1, 5, *S.C.*, 418 Mass. 769 (1994). See also *Commonwealth v. Mathews*, 31 Mass. App. Ct. 564, 571-572 (1991); *Commonwealth v. Futch*, 38 Mass. App. Ct. 174, 177 (1995). The defendant's conviction for unlawfully possessing a firearm therefore must be reversed.

3. *Career criminal conviction.* At the separate bench trial on the charge against the defendant of unlawfully possessing a firearm having been previously convicted of three violent crimes or serious drug offenses, the Commonwealth introduced documents showing that a Luis Maldonado had been convicted in Suffolk Superior Court on April 30, 1997, on indictment no. 96-1129 charging him with possession of a Class B controlled substance with intent to distribute. The Commonwealth also introduced documents showing that a Luis Maldonado had pleaded guilty in Middlesex Superior Court on November 15, 1991, on indictment no. 91-1460 charging him with possession of a Class B controlled substance with intent to distribute, and also on indictment no. 91-3598 charging him with distribution of a Class B controlled substance.

The Commonwealth also called as a witness Anita Collins, who was employed as a records manager for the Department of Correction. Collins authenticated various records maintained by the department pertaining to the defendant, which were then introduced as an exhibit and reviewed by the judge.[3] The records showed that the defendant had been incarcerated on Middlesex Superior Court docket numbers 91-1460 and 91-3598 at M.C.I., Concord, on November 25, 1991, and on Suffolk

---

[3]We note that, while claiming that the evidence was insufficient to warrant his conviction as a career criminal, the defendant has failed to ensure that a copy of this exhibit was included in the record on appeal, as he should have done. See *Commonwealth v. Woody*, 429 Mass. 95, 97 (1999). We can discern from the transcript of Ms. Collins's testimony, however, that the records contained the information described in the text.

Superior Court docket number 96-1129 at M.C.I., Gardner, on January 21, 1999. The records also contained photographs of the defendant taken at the time of his incarcerations and also a listing of various distinguishing physical characteristics including, as of 1993, a circle scar on the left side of his face.

Finally, the Commonwealth called as witnesses Detective Gerald Baptist of the Cambridge police department and Officer Lyle Abell of the Chelsea police department. Detective Baptist testified that he had arrested the defendant, whom he knew as "Q," in April, 1991, for distribution of cocaine and that the defendant had subsequently been convicted. Officer Abell similarly testified that he had arrested the defendant, whom he also knew as "Q," in July, 1996, for distribution of cocaine and that the defendant had subsequently been convicted.

The defendant nevertheless claims that the evidence was insufficient to support his conviction as a career criminal because it was insufficient to establish that he was the same Luis Maldonado who was named in the prior convictions. More specifically, citing *Commonwealth* v. *Koney,* 421 Mass. 295, 301-302 (1995), the defendant claims that the Commonwealth was required to call as witnesses law enforcement officials who could testify to whether the defendant was the same Luis Maldonado convicted in the particular cases that the Commonwealth introduced through certified convictions.

In *Commonwealth* v. *Koney,* however, the Commonwealth attempted to prove that the defendant had been convicted of operating a motor vehicle while under the influence of intoxicating liquor on three prior occasions merely by introducing documents showing that a person having the same name as the defendant had been the subject of such convictions. In holding that this evidence was insufficient to support a conviction of the defendant for a fourth offense of operating a motor vehicle while under the influence of intoxicating liquor, the court said only that "[m]ere identity of name is not sufficient to indicate an identity of person." *Commonwealth* v. *Koney, supra* at 302. Here, by contrast, in addition to the convictions showing an identity of name, the Commonwealth introduced substantial additional evidence showing that the defendant was the same person named in the convictions, including evidence that the

defendant had been incarcerated pursuant to the convictions. This evidence was more than sufficient to warrant a finding that the defendant was the same Luis Maldonado who was named in the prior convictions. See *Commonwealth* v. *Latimore*, 378 Mass. 671, 677-678 (1979); *Corson* v. *Commonwealth*, 428 Mass. 193, 196-197 (1998).

Nevertheless, because we have previously concluded that the defendant's conviction for unlawful possession of a firearm must be reversed, his conviction as a career criminal must also be reversed due to the absence of any predicate conviction for unlawfully possessing a firearm. See G. L. c. 269, § 10G(*c*).

*Judgments reversed.*

*Verdict and finding
set aside.*