NOTICE: All slip opinions and orders are subject to formal revision and are superseded by the advance sheets and bound volumes of the Official Reports. If you find a typographical error or other formal error, please notify the Reporter of Decisions, Supreme Judicial Court, John Adams Courthouse, 1 Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-1030; SJCReporter@sjc.state.ma.us

17-P-446                                              Appeals Court

COMMONWEALTH  vs.  DERRICK SCOTT.

No. 17-P-446.

Suffolk.     April 9, 2019. - November 30, 2020.

Present:  Green, C.J., Sullivan, & Ditkoff, JJ.

Rape. Kidnapping. Consent. Deoxyribonucleic Acid. Appeals
    Court, Appeal from order of  single justice. Jury and
    Jurors. Constitutional Law, Jury, Admissions and
    confessions, Voluntariness of statement, Assistance of
    counsel. Evidence, Admissions and confessions,
    Voluntariness of statement. Practice, Criminal, Jury and
    jurors, Empanelment of jury, Examination of jurors,
    Challenge to jurors, Instructions to jury, Lesser included
    offense, Motion to suppress, Admissions and confessions,
    Voluntariness of statement, Redaction, Assistance of
    counsel, Amendment of indictment or complaint.

Indictments found and returned in the Superior Court
Department on October 13, 2011.

A pretrial motion to suppress evidence was heard by Shannon
Frison, J., and the cases were tried before Mitchell H. Kaplan,
J.

A postconviction motion to compel access to juror
questionnaires was heard by Singh, J., in the Appeals Court.

Alan Edward Zeltserman for the defendant.
Dara Z. Kesselheim, Assistant District Attorney (Amy Martin

Zacharias, Assistant District Attorney, also present) for the
Commonwealth.

     DITKOFF, J.  The defendant, Derrick Scott, appeals after a
Superior Court jury trial from convictions of rape, G. L.
c. 265, § 22 (b), and kidnapping, G. L. c. 265, § 26.  He also
appeals from an order of a single justice of this court denying
his postconviction motion to compel the clerk of the Superior
Court to provide him with access to juror questionnaires.  We
conclude that a party to a criminal case may be granted access
to juror questionnaires, upon such conditions to preserve their
confidentiality that a judge in an exercise of discretion
considers prudent, if that party demonstrates that the juror
questionnaires would be useful or relevant to postconviction
litigation.  Having reviewed the juror questionnaires and
determined that they are not useful or relevant, we affirm the
order of the single justice.

     Regarding the defendant's claims of error by the Superior
Court judges, we conclude that the trial judge acted within his
discretion in allowing the Commonwealth's peremptory challenges.
We conclude that the defendant was not entitled to an
instruction on the lesser included offenses of indecent assault
and battery or simple assault and battery where both the
defendant and the victim stated that the defendant penetrated
the victim's vagina, and we reject the defendant's contention

that he was entitled to an instruction on withdrawal of consent because the victim asked him to wear a condom before raping her. We conclude that the judge who heard the defendant's motion to suppress properly concluded that the defendant voluntarily made statements and waived his Miranda rights even where the police did not inform the defendant why he was under arrest. We discern no substantial risk of a miscarriage of justice from the admission of the defendant's recorded police interview where all redactions requested by the defendant at trial were made. Finally, we conclude that a defendant does not have a right to have counsel appointed in connection with a prearraignment motion to amend indictments. Accordingly, we affirm the judgments.

1. Background. In October 1996, the victim was a twenty-one year old senior at Boston University. She was living in an apartment in the Brighton section of Boston with a college friend. One day, the defendant knocked on the victim's door and stated that he was selling magazines for school. The defendant and the victim started talking, and the victim invited the defendant inside her apartment. The defendant said that his name was Derrick and that he was from Georgia. The victim's roommate was not home at the time.

After approximately an hour, the defendant said, "[I]f I ask you something do you promise to say yes?" The victim said,

"[N]o, I don't promise."  The defendant then tried to kiss the victim, who pushed him away and told him that it was time for him to go.  The defendant put his arm around the victim's neck, dragged her into her roommate's bedroom, and placed her on the bed.

The defendant pinned the victim's hands over her head and pulled down her shorts.  She begged the defendant to "please stop," but he continued.  The victim then asked him if he had a condom and told him that she had one in her purse.  When the defendant got off the victim to retrieve the condom, she grabbed her roommate's phone.  The defendant took the phone from the victim and threw it before she could use the phone to summon help.

The defendant then used one hand to pin the victim's arms and the other to place his fingers inside her vagina.  The victim asked the defendant "to please stop" and told him that "it really hurt."  The defendant did not stop, and pulled down his pants and "started to rub his penis up and down inside of [her] vagina, the lips of [her] vagina, up and down really, really hard."  The victim again begged the defendant "to please stop," and told him that she could not breathe.  The defendant stated that he would let the victim breathe if she "would have sex with him."  As the defendant placed his penis inside the

victim's vagina, the victim said, "[P]lease stop, please stop, why are you going this to me, you're hurting me."

The defendant ejaculated inside the victim and on the sheets.  He then "rubbed his penis up and down kind of inside of the lips of [the victim's] vagina, hard, a few more times." Finally, he stopped and put his pants back on.  The defendant said, "I guess you're going to call the police now," then said, "[H]ave a nice day" and left.

The victim spoke with the police and was transported to a hospital by ambulance.  There, a nurse collected samples from the victim's vaginal and genital areas.  Semen was detected on the genital swabs, but not the vaginal swabs.  In 2000, the Boston Police crime laboratory created a deoxyribonucleic acid (DNA) profile from semen on the genital swabs and submitted the profile to a national database in an attempt to identify the perpetrator.  In 2011, the defendant's DNA profile was entered into the database after an unrelated arrest.

In April 2014, based on a match in DNA profiles from the national database,[1] Boston police obtained an arrest warrant for the defendant, who was living in California.  Local police officers executed the warrant at their request.  Two Boston detectives interviewed the defendant in California.

---

[1] The jury did not hear about either the previous arrest or the match from the database.

The detectives began the recorded interview by advising the defendant of his Miranda rights.  The defendant stated that he grew up in Georgia and initially denied ever being in New England or selling magazines.  The defendant continued denying ever having been in Boston after the detectives told the defendant that his DNA matched a 1996 rape kit from that city.  The defendant, however, described the victim of that crime as a "young woman" and a "white girl."  The detectives pointed out that they had not provided this information.  Eventually, the defendant acknowledged having what he described as consensual sex with a "college-age" "[w]hite girl" he met while selling magazines in Boston.  The defendant stated that his penis was inside that woman's vagina for "maybe two pumps."  He stated that the woman became angry when he left after having sex.

After his arrest, the police obtained an oral swab from the defendant.  His DNA profile was a statistical match to the semen taken from the victim in 1996 with a vanishingly small random match probability.

2.  Peremptory challenges.  When challenging the propriety of a peremptory challenge, "the burden is on the objecting party to make a prima facie showing of impropriety that overcomes the presumption of regularity afforded to peremptory challenges."  Commonwealth v. Rosa-Roman, 485 Mass. 617, 635 (2020), quoting Commonwealth v. Robertson, 480 Mass. 383, 390-

391 (2018).  "If the judge finds that the presumption has been rebutted, the burden shifts to the prosecutor to articulate a nondiscriminatory or 'group-neutral' reason for the challenge."  Commonwealth v. Mason, 485 Mass. 520, 530 (2020), quoting Commonwealth v. Oberle, 476 Mass. 539, 545 (2017).  "Finally, the 'judge must then determine whether the explanation is both "adequate" and "genuine."'"  Commonwealth v. Sanchez, 485 Mass. 491, 493 (2020), quoting Oberle, supra.  "We review a judge's decision as to whether to allow a peremptory challenge for an abuse of discretion."  Mason, supra.

a.  Prospective juror no. 21.  After five jurors had been seated, the Commonwealth used a peremptory challenge on a juror whom the judge described as the second African-American man to be examined.[2]  The juror had not filled out the portion of the juror questionnaire that asked about prior involvement with the court system.  When asked by the prosecutor, the juror disclosed that he had been arrested in the same county where the trial was being held for domestic violence.  When the prosecutor asked the juror whether he believed he had been falsely accused, he stated, "I can't say that," but then stated that he and his partner had merely "argued."

_____

[2] The first African-American man was excused for cause because his father was a police officer and he stated that he would find the testimony of a police officer more credible than that of a civilian witness.

The prosecutor sought to exercise a peremptory challenge to exclude this juror, the defendant objected, and the judge asked the prosecutor for the reason for the challenge. The prosecutor explained that the basis for the challenge was the prior arrest, the juror's failure to fill out the questionnaire fully, and his failure to "answer the question of whether he believed he was falsely accused about it." The judge accepted this explanation and excused the juror. The defendant objected but did not question the prosecutor's explanation.

The judge acted within his discretion in allowing this peremptory challenge. A "prosecutor's concern regarding, essentially, the ability of the juror to follow simple instructions," such as to disclose prior involvement with the court system, is a legitimate one. Commonwealth v. Rodriguez, 457 Mass. 461, 473 (2010). Similarly, the prosecutor could reasonably be concerned with the juror's equivocal answer regarding whether he had been treated fairly by her own office. In this regard, the prosecutor had already used a peremptory challenge on a female juror who had been similarly ambivalent about the treatment of her best friend's brother by the same prosecutor's office[3] and had questioned another female juror

_____

[3] When the prosecutor asked that juror whether the brother was treated fairly, she replied, "I mean, I guess I had my own opinions, but yes, he was given a fair trial, I guess."

about her opinion of the treatment afforded her father and brother in a prosecution by the same office.[4]  The prosecutor was not required to adopt the defendant's view, expressed for the first time on appeal, that the juror's explanation was in fact candid.[5]

    b.  <u>Prospective juror no. 35</u>.  After eight jurors had been seated, the defendant objected to the prosecutor's next peremptory challenge of an African-American man.  This prospective juror had worked for the Committee for Public Counsel Services for four years and then as a defense attorney. He stated that he had "defended folks [for] many worse crimes" than armed robbery with a firearm, of which the juror had been a victim.  He had known defendant's counsel for more than fifteen years and had been tried by the same prosecuting office in the past, when, he stated, he was "falsely accused of motor vehicle insurance fraud."  He went to trial and the case was eventually

_____

[4] That juror unequivocally stated that her relatives were treated fairly, and the prosecutor did not exercise a peremptory challenge.

[5] Similarly, the judge did not err in failing to consider that -- hours later -- both parties would choose not to challenge an already seated non-African-American juror for whom a criminal record check had revealed nondisclosed juvenile charges and a nondisclosed charge of operating under the influence.  The judge is not required to be clairvoyant, and the parties may well have different standards for exercising peremptory challenges that would involve reopening the empanelment process.

resolved by a continuance without a finding. When the defendant objected to the prosecutor's peremptory challenge, the judge immediately cut in and said, "[T]he fact is that [the juror] was a criminal defense lawyer. That's a reasonable basis on which to exercise a peremptory challenge."

As the Supreme Judicial Court has recently clarified, "the presumption of propriety [of a peremptory challenge] is rebutted when 'the totality of the relevant facts gives rise to an inference of discriminatory purpose.'" Sanchez, 485 Mass. at 511, quoting Johnson v. California, 545 U.S. 162, 168 (2005). We consider a number of factors:

> "(1) the number and percentage of group members who have been excluded from jury service due to the exercise of a peremptory challenge;

> "(2) any evidence of disparate questioning or investigation of prospective jurors;

> "(3) any similarities and differences between excluded jurors and those, not members of the protected group, who have not been challenged (for example, age, educational level, occupation, or previous interactions with the criminal justice system);

> "(4) whether the defendant or the victim are members of the same protected group; and

> "(5) the composition of the seated jury."

(Footnotes omitted.) Sanchez, supra at 512. Furthermore, "the possibility of an objective group-neutral explanation for the strike or strikes . . . may play a role in the first-step

analysis as well." Robertson, 480 Mass. at 392, quoting Commonwealth v. Jones, 477 Mass. 307, 322 & n.25 (2017).

Here, our information on the race of the prospective jurors is quite limited. At this point in the empanelment process, one non-African-American man, six women of unknown (to us) race, and one man of unknown (to us) race had been seated. The prosecutor had used peremptory challenges only on juror no. 21 and a female juror. The prosecutor, however, had challenged both of the jurors who, like juror no. 35, expressed skepticism about the fairness of the criminal justice system.[6] Only one juror with a criminal record had been seated, and that juror had reported only a disorderly conduct charge in college that had been dismissed. In light of this, the judge faced with a peremptory challenge of a long-time defense attorney with a criminal record who believed that he had been wrongly prosecuted by the same prosecuting office could reasonably determine that "the totality of the relevant facts" gave rise to no "inference of discriminatory purpose." Sanchez, 485 Mass. at 511, quoting Johnson, 545 U.S. at 168.

This case is similar to Commonwealth v. Lopes, 478 Mass. 593 (2018). There, the Supreme Judicial Court affirmed the trial judge's determination that the presumption of propriety

---

[6] Another juror who opined that he had been treated unfairly by the criminal justice system had been excused for cause.

had not been overcome where a juror's "two significant experiences with the law provided a sufficient and obvious basis for the prosecutor's peremptory challenge."  Id. at 601. Contrast Robertson, 480 Mass. at 393 (judge should have inquired about prosecutor's reasons for peremptory challenge where "[t]he record offers little insight into what potential neutral reason the Commonwealth might have offered").[7]  The judge acted within his discretion.

3.  Access to juror questionnaires.  Each prospective juror is required to fill out a confidential juror questionnaire prior to empanelment.  G. L. c. 234A, § 22.  See Commonwealth v. Espinal, 482 Mass. 190, 195 (2019).

> "The information elicited by the questionnaire shall be such information as is ordinarily raised in voir dire examination of jurors, including the juror's name, sex, age, residence, marital status, number and ages of children, education level, occupation, employment address, spouse's occupation, spouse's employment address, previous service as a juror, present or past involvement as a party to civil or criminal litigation, relationship to a police or law enforcement officer, and such other information as the jury commissioner deems appropriate."

G. L. c. 234A, § 22.  Accord Commonwealth v. Lopes, 440 Mass. 731, 735 (2004).[8]  Copies of the completed questionnaires are

---

[7] To be sure, the better practice is for a judge to pretermit the first step and move directly to requesting an explanation for a peremptory challenge from the prosecutor.  See Sanchez, 485 Mass. at 514; Lopes, 478 Mass. at 598.

[8] On a case-by-case basis, the standard juror questionnaire may be supplemented by additional questions.  See, e.g.,

provided to counsel and the judge during empanelment where, of course, they are invaluable tools for the empanelment process. G. L. c. 234A, § 23.  See, e.g., Commonwealth v. Rios, 96 Mass. App. Ct. 463, 467 (2019).  At the completion of empanelment, counsel must return their copies to the clerk and hold in confidence the information contained therein.  G. L. c. 234A, § 23.  The questionnaires of those who are not selected are destroyed; the questionnaires of those who are selected (either as deliberating or alternate jurors) are retained by the clerk of court "until final disposition of the case," which should include the direct appeal.  G. L. c. 234A, § 23.

"Except for disclosures made during voir dire or unless the court orders otherwise, the information inserted by jurors in the questionnaire shall be held in confidence by the court, the clerk or assistant clerk, the parties, trial counsel, and their authorized agents."  G. L. c. 234A, § 23.  Accordingly, after empanelment is completed, the clerk may not provide the parties with access to the questionnaires absent a court order.

Juror questionnaires can provide vital information for postconviction litigation.  For example, a claim based on a juror's omissions of information from a questionnaire might be impossible to adjudicate without access to the questionnaire in

---

Commonwealth v. Billingslea, 484 Mass. 606, 627 (2020); Commonwealth v. Gilman, 89 Mass. App. Ct. 752, 762 (2016).

question.  See, e.g., Commonwealth v. Torres, 437 Mass. 460, 468-469 (2002); Commonwealth v. Gonsalves, 96 Mass. App. Ct. 29, 30-31 (2019).  A claim of ineffective assistance of counsel based on counsel's failure to exercise a peremptory challenge could require the information on a questionnaire. See Commonwealth v. Ortiz, 50 Mass. App. Ct. 304, 309 (2000).

Even where access to a juror questionnaire is not critical, it may be helpful or otherwise relevant.  For example, a claim of juror bias might be assisted by the information in the questionnaires.  See, e.g., Commonwealth v. Richardson, 469 Mass. 248, 255 & n.13 (2014).  Where a party justifies a challenged peremptory challenge on the basis of a potential juror's answers on the questionnaire, access to that questionnaire could be quite useful.  See, e.g., Robertson, 480 Mass. at 395 & n.9; Commonwealth v. Maldonado, 55 Mass. App. Ct. 450, 457 & n.2 (2002), S.C., 439 Mass. 460 (2003); Commonwealth v. Cavotta, 48 Mass. App. Ct. 636, 638-639 & n.3 (2000). Similarly, in that circumstance, access to the other questionnaires could be useful for comparison purposes. Cf. Trustees of Health & Hosps. of Boston, Inc. v. Massachusetts Comm'n Against Discrimination, 449 Mass. 675, 684-685 (2007) (discussing comparator evidence).

Where a party wants access to a juror questionnaire and can demonstrate that such access could potentially assist in

litigating a viable postconviction issue, a judge should grant
some form of access while remaining cognizant of the vital
importance of the confidentiality of juror questionnaires.
See Commonwealth v. Womack, 457 Mass. 268, 279 & n.11 (2010)
(confidentiality of questionnaires vital to jurors'
confidence); Commonwealth v. Howard, 46 Mass. App. Ct. 366, 368-
369 (1999) (same).  Potential assistance is a relatively low
bar.  The judge may structure an order, however, to preserve
that confidentiality to the extent practical, for example, by
impounding the questionnaire so that it will be placed only in
an impounded appendix.  Where the usefulness of a questionnaire
is uncertain, a judge may choose to have counsel first view the
questionnaire in camera, returning to request a copy only if the
questionnaire proves significant.

Here, the defendant moved for access to all of the juror
questionnaires in Superior Court after the entry of his appeal
in this court, but he neither filed a timely notice of appeal
from the order denying the motion for access, nor argues in his
brief to this court that this denial was error.[9]  Accordingly,

---

[9] The defendant filed a notice of appeal from the denial of
his motion for access 364 days after the motion was denied.  He
then specifically asked the clerk not to assemble the record for
appeal.  The defendant confirmed at oral argument that this was
a strategic decision.

the propriety of that denial is not before us.  See Commonwealth v. Frias, 53 Mass. App. Ct. 488, 495 (2002).

Instead, after unsuccessfully challenging the denial in a petition under G. L. c. 211, § 3, see Scott v. Commonwealth, 479 Mass. 1034 (2018), the defendant filed a motion with a single justice of this court to compel the Superior Court clerk to provide him with access to the juror questionnaires, or, in the alternative, to determine "that said questionnaires are part of the record on appeal that should be provided to" the defendant. It is from the single justice's order denying this motion that the defendant timely noticed an appeal.

"It is well settled that this court will not reverse an order of a single justice in the absence of an abuse of discretion or clear error of law."  Howard v. Boston Water & Sewer Comm'n, 96 Mass. App. Ct. 119, 123 (2019), quoting Commonwealth v. Springfield Terminal Ry. Co., 77 Mass. App. Ct. 225, 229 (2010).  The single justice, however, lacked the authority to decide the defendant's appeal of the Superior Court judge's order denying the defendant's motion for access to the questionnaires.  See DeLucia v. Kfoury, 93 Mass. App. Ct. 166, 168 (2018).  That question had to be presented to a panel of this court by a proper notice of appeal and briefing.

The defendant's alternative claim for relief, that "the instant request for access to jury questionnaires should be

sufficient in itself to establish the right of [the defendant] to access the questionnaires as he seeks to perfect the direct appeal of his criminal conviction," is not persuasive. The mere fact that a document is part of the record on appeal, see Mass. R. A. P. 8 (a), as amended, 378 Mass. 932 (1979) ("The original papers and exhibits on file, the transcript of proceedings, if any, and a certified copy of the docket entries prepared by the clerk of the lower court shall constitute the record on appeal in all cases");[10] Maldonado, 55 Mass. App. Ct. at 457 n.2, does not necessarily mean that any party is entitled to unfettered access, or indeed any access, to it. When, for example, a judge conducts an in camera hearing on a witness's invocation of the privilege against self-incrimination pursuant to Commonwealth v. Martin, 423 Mass. 496, 504-505 (1996), the transcript of that hearing is a part of the record on appeal and is reviewed by the appellate court but is not accessible to the parties under any circumstances. See Pixley v. Commonwealth, 453 Mass. 827, 834-835 (2009); Commonwealth v. Pixley, 77 Mass. App. Ct. 624, 628 (2010). As we have stated, whether a party is entitled to access to the juror questionnaires is a question for the trial

---

[10] The Massachusetts Rules of Appellate Procedure were wholly revised, effective March 1, 2019. See Reporter's Notes to Rule 1, Mass. Ann. Laws Court Rules, Rules of Appellate Procedure, at 466 (LexisNexis 2019). The analysis would be the same under the current version of Mass. R. A. P. 8 (a), as appearing in 481 Mass. 1611 (2019).

court judge upon a showing that such questionnaires would potentially be useful or relevant in litigating a postconviction matter, and the defendant did not appeal from the judge's ruling in this regard. Accordingly, the single justice properly denied the defendant's motion.

Even though the defendant has waived his right to review of these issues in this appeal, we are cognizant that the juror questionnaires are, in fact, relevant to the defendant's issue concerning the peremptory challenges, which involve, among other things, a juror's failure to answer a question on the questionnaire. Although juror no. 21's questionnaire has been destroyed (because he was not seated), whether any other seated jurors failed to answer a question or otherwise displayed similar nonracial characteristics as the struck jurors in their questionnaires is important information. Accordingly, as we have done in the past when a question concerning the use of peremptory challenges on the basis of race has been raised, we ordered the questionnaires from the trial court and have reviewed them carefully. See Maldonado, 55 Mass. App. Ct. at 457 & n.2.

None of the seated jurors failed to answer a question on the questionnaire. None of the seated jurors described any experience as a defense attorney or in a related job. Regarding criminal records, one juror reported being charged with

disorderly conduct in college, but the judge read that information into the record. Three other jurors described a criminal history of a relative or partner, but again the judge read that information into the record. One juror stated that a distant relative had served time for draft resistance in World War II. This information was not read into the record, but it is not helpful to the defendant. Accordingly, nothing in the juror questionnaires calls into question our conclusions regarding the peremptory challenges.

4. <u>Instruction on lesser included offenses</u>. At trial, the defendant requested the judge to instruct the jury on two lesser included offenses of rape, indecent assault and battery, and simple assault and battery. The trial judge declined, reasoning that no view of the evidence supported either instruction. "A lesser included offense instruction should be given where 'the evidence at trial presents "a rational basis for acquitting the defendant of the crime charged and convicting him of the lesser included offense."'" <u>Rios</u>, 96 Mass. App. Ct. at 476, quoting <u>Commonwealth</u> v. <u>Donlan</u>, 436 Mass. 329, 335 (2002). In deciding whether a lesser included offense instruction is appropriate, "we draw all reasonable inferences from the evidence in favor" of the defense. <u>Commonwealth</u> v. <u>Dyous</u>, 436 Mass. 719, 731 (2002). Nonetheless, "even when evidence is introduced that would justify conviction for a lesser included

offense, the defendant is not entitled to an instruction thereupon unless the proof on the 'elements differentiating the two crimes is sufficiently in dispute so that the jury may consistently find the defendant innocent of the greater and guilty of the lesser included offense.'" Donlan, supra, quoting Commonwealth v. Souza, 428 Mass. 478, 494 (1998).

Here, the victim unambiguously testified that the defendant penetrated her vagina, both digitally and with his penis.  The defendant likewise unambiguously stated that there was penetration; he told the police that his penis "was in the vagina."  Although the defendant focuses on the victim's testimony that she saw the defendant ejaculate and that he "rubbed his penis up and down kind of inside the lips of [her] vagina," that testimony casts no doubt upon this element.  It is well settled that "[i]ntrusion into the vagina itself is not required to make out the wrongful penetration.  Touching by the male of the vulva or labia . . . is intrusion enough." Donlan, 436 Mass. at 336, quoting Commonwealth v. Baldwin, 24 Mass. App. Ct. 200, 204-205 (1987).[11]

Although the jury had the right to disbelieve any portion of the evidence, and could have selectively disbelieved portions

---

[11] For this reason, the defendant's statement in closing argument that "the penis didn't go into the vagina here" is a non sequitur, if it was intended as a remark on the element of penetration.

of the victim's testimony, "the mere possibility that the jury might not credit a portion of the Commonwealth's evidence" is not enough to entitle the defendant to an instruction on a lesser included offense. Donlan, 436 Mass. at 337. Where the case was tried on the question whether the victim consented to the penetration and not whether it occurred, no rational jury could have convicted the defendant of the lesser included offenses while acquitting him of rape.

5. Instruction on withdrawal of consent. In Commonwealth v. Sherman, 481 Mass. 464, 472-473 (2019), the Supreme Judicial Court held that, where a victim consents to sexual penetration but withdraws consent during the course of sexual intercourse, the Commonwealth must prove that the victim communicated the withdrawal of consent to prove that a rape occurred. Such withdrawal of consent may be communicated through resistance, words, or gestures, such as attempting to move away. See id. at 474. "[T]he Commonwealth need not prove that the defendant actually knew that the victim withdrew consent. It suffices that the victim reasonably communicated the withdrawal of consent in such a manner that a reasonable person would have known that consent had been withdrawn." Id.

It is unsurprising that the defendant failed to request such an instruction, as Sherman was decided over three years

after the trial here.[12]  The defendant now claims that such an instruction should have been given, because the victim's request that the defendant use a condom while raping her evidenced her consent.  We review this claim for a substantial risk of a miscarriage of justice, see Sherman, 481 Mass. at 475-476, and, finding it without merit, we discern none.

Society long ago moved beyond the point where a victim's request that a rapist use a condom could be considered consent.  See People v. Ireland, 188 Cal. App. 4th 328, 336 (Cal. Ct. App. 2010) (noting standard instruction in California that "[e]vidence that the woman requested [the defendant] to use a condom or other birth control device is not enough by itself to constitute consent"); Mack v. State, 338 Ga. App. 854, 857 (2016) (fact that victim asked defendant to put on condom did not negate her fear); State v. Troutman, 148 Idaho 904, 911 (2010) (whether defendant wore condom "is irrelevant to the

---

[12] The defendant suggests that he somehow did request a Sherman instruction when he asked for an instruction consistent with Commonwealth v. Lopez, 433 Mass. 722, 727-728 (2001), in which the Supreme Judicial Court rejected the proposition that a defendant is entitled to an instruction on the defense of an honest and reasonable mistake as to the victim's consent.  The judge, however, opined that his instruction was consistent with Lopez and invited the defendant to submit any proposed language. The next morning, the defendant said, "I think the instruction is okay."  Even if we could somehow discern what the defendant was thinking, this would not preserve the issue.  See Commonwealth v. King, 77 Mass. App. Ct. 194, 197 (2010), S.C., 460 Mass. 80 (2011).

consent question"); <u>Tyson</u> v. <u>State</u>, 619 N.E.2d 276, 295-296 (Ind. Ct. App. 1993) (victim's testimony that she asked defendant, "Please put a condom on" during assault "could not, as a matter of law, lead a reasonable person to believe that [the defendant] was reasonably mistaken as to [the victim's] consent to sexual intercourse"); <u>State</u> v. <u>Anderson</u>, 66 So. 3d 568, 580 (La. Ct. App. 2011) (rejecting contention that there was consent where victim testified "she asked him to use a condom"; "Defendant fails to cite any case law to support that use of a condom necessarily equates with consensual sex").

Here, the victim testified that the sexual encounter with the defendant was nonconsensual at all times. She pushed the defendant away when he first tried to kiss her, and asked that he use a condom only once he had dragged her into the bedroom and pinned her arms down while ignoring her pleas to stop. To be sure, the defendant told the police that the victim had consented to the entire sexual encounter. The Supreme Judicial Court, however, has held that "the defendant's testimony that the victim consented to sexual intercourse will not suffice alone to warrant an instruction on the withdrawal of consent after penetration." <u>Sherman</u>, 481 Mass. at 475. As there was no basis for concluding that the victim initially consented to intercourse and then withdrew that consent, there was no basis for a <u>Sherman</u> instruction. See <u>Commonwealth</u> v. <u>Butler</u>, 97 Mass.

App. Ct. 223, 235 (2020) (not reasonable to believe that incapacitated individual in protective custody and under defendant police officer's control consented to indecent assault and battery).

6. <u>Motion to suppress statements</u>. a. <u>Standard of review</u>. The motion judge denied the defendant's motion to suppress his statements during the police interview, finding that (1) the defendant knowingly, intelligently, and voluntarily waived his Miranda rights, and (2) his statements were voluntary. "On appeal, we review a ruling on a motion to suppress by accepting 'the judge's subsidiary findings of fact absent clear error but conduct an independent review of [the] ultimate findings and conclusions of law.'" <u>Commonwealth</u> v. <u>Polanco</u>, 92 Mass. App. Ct. 764, 769 (2018), quoting <u>Commonwealth</u> v. <u>Ramos</u>, 470 Mass. 740, 742 (2015). Where, as here, there is a video recording of the interview of the defendant, we "may independently review [the] documentary evidence, and . . . findings drawn from such evidence are not entitled to deference." <u>Commonwealth</u> v. <u>Tremblay</u>, 480 Mass. 645, 654-655 (2018). Accord <u>Commonwealth</u> v. <u>Molina</u>, 467 Mass. 65, 72 (2014), quoting <u>Commonwealth</u> v. <u>Hoyt</u>, 461 Mass. 143, 148-149 (2011) ("we will 'take an independent view' of recorded confessions and make judgments with respect to their contents without deference to the fact

finder, who 'is in no better position to evaluate the[ir] content and significance'").

b. <u>Waiver of Miranda rights</u>. The Commonwealth bore the initial burden of proving beyond a reasonable doubt that the defendant's waiver of Miranda rights was "voluntary, knowing, and intelligent." <u>Commonwealth</u> v. <u>Clarke</u>, 461 Mass. 336, 342 (2012). Accord <u>Commonwealth</u> v. <u>Rivera</u>, 482 Mass. 259, 265-266 (2019). "Relevant factors in this analysis include the manner in which the interrogation is conducted, whether Miranda warnings were given, the defendant's physical and mental condition, and the defendant's individual characteristics, such as age, education, intelligence, and emotional stability." <u>Id</u>. at 266. Whether a waiver is voluntary depends on "the totality of the circumstances." <u>Commonwealth</u> v. <u>Gallett</u>, 481 Mass. 662, 668 (2019).

Here, the defendant "was informed of his Miranda rights and indicated verbally and in writing that he understood the warnings." <u>Gallett</u>, 481 Mass. at 669. The defendant was thirty-six years old at the time of the interrogation, his emotional and physical condition was unremarkable, and there is no indication that the defendant had cognitive limitations that would affect his waiver and voluntary statements. The detectives made no intentional misrepresentations that could have undermined the defendant's ability to make a free choice,

and they did not impermissibly maximize the apparent strength of the Commonwealth's case.  See id. at 670-671; Commonwealth v. Spray, 467 Mass. 456, 467-468 (2014).

The detectives' failure to inform the defendant of the charges against him until midway into the interview did not vitiate the voluntariness of the defendant's Miranda waiver, contrary to his claims.  At no point did the detectives make a false statement about the charges in Boston, but they did avoid telling the defendant he was charged with rape until after he had categorically denied ever being in Boston.  "[A]ny lack of disclosure regarding the ground for an arrest is not the type of 'trick[ery]' that would prevent the defendant's waiver from being knowing, intelligent, and voluntary."  Commonwealth v. Cartwright, 478 Mass. 273, 281-282 (2017), quoting Commonwealth v. Medeiros, 395 Mass. 336, 345 (1985). "The police are not required to 'inform a suspect of the nature of the crime about which he is to be interrogated.'"  Commonwealth v. Hensley, 454 Mass. 721, 738 (2009), quoting Medeiros, supra.  Accord Molina, 467 Mass. at 76 n.13 (failure to inform suspect of nature of crime "does not itself render a statement involuntary").

c.  Voluntariness of statements.  To use the defendant's statements as evidence against him at trial, the Commonwealth also "must show that any statement made [by a defendant] after a

waiver was voluntary, as a product of the defendant's 'rational intellect and free will.'" Rivera, 482 Mass. at 266, quoting Commonwealth v. Hoose, 467 Mass. 395, 403 (2014). In deciding whether the Commonwealth met its burden, we may consider, among other relevant factors, "the defendant's age, education, intelligence, physical and mental stability, and experience with the criminal justice system." Commonwealth v. Siny Van Tran, 460 Mass. 535, 559 (2011).

Here, the defendant at all times displayed a knowing comprehension of the questions asked of him and voiced lucid and logical responses, which reflected an effort to exonerate himself. See Commonwealth v. Libby, 472 Mass. 37, 49 (2015) (defendant's exculpatory explanations of events suggested statements were product of defendant's own free will). The defendant responded appropriately to substantive questions posed by the officers, demonstrating an understanding of the nature of their questioning. See Tremblay, 480 Mass. at 656-658 (defendant was responsive to police questions and even minimized his culpability, leading to conclusion that defendant's statements were voluntarily given). Based on the totality of the circumstances, we see no reason to disturb the motion judge's ultimate finding that the Commonwealth had established, beyond a reasonable doubt, that the defendant had knowingly, intelligently, and voluntarily waived his Miranda rights and

that he made his statements to the police voluntarily. See <u>Gallett</u>, 481 Mass. at 672; <u>Libby</u>, <u>supra</u> at 48-50.

7. <u>Redaction of video-recorded interrogation</u>. The parties spent considerable effort during trial redacting the video recording of the interview. The Commonwealth's original position was that the defendant's denials should not be admitted, but the trial judge disagreed. The parties then discussed the scope of redactions. The defendant, although noting that he wanted the entire interview suppressed, explained that he "want[ed] more of it rather than less of it" to be admitted. The parties presented the disputed redactions to the trial judge, and the judge ruled on them, siding with the Commonwealth on some redactions and with the defendant on others.

On appeal, the defendant proposes additional redactions. Because the defendant did not request these redactions at trial, review is waived and we consider only whether there was a substantial risk of a miscarriage of justice. See <u>Commonwealth</u> v. <u>Rivera</u>, 97 Mass. App. Ct. 285, 292 (2020); <u>Commonwealth</u> v. <u>Sanchez</u>, 96 Mass. App. Ct. 1, 8 n.8 (2019). We discern none.

The defendant vaguely asserts that accusatory statements by the officers should have been redacted. The interview, however, did not include "repeated statements [by the officers] that they did not believe the defendant." <u>Commonwealth</u> v. <u>Santos</u>, 463

Mass. 273, 288-289 (2012) (admission of officers' frequent accusations that defendant was lying improper).  The defendant also asserts that a reference to the defendant's being on probation was mistakenly retained.  The parties, by their own description, "went to great pains . . . to make sure that every mention of every arrest that [the defendant] ever had, including the [operating under the influence] prior arrest, anything having to do with bad acts or encounters with the law [was] excised."  That the parties missed one mumbled reference to probation does not create a substantial risk of a miscarriage of justice.  Similarly, it is difficult to find error, much less a substantial risk of a miscarriage of justice, from the inclusion of the defendant's criticism of his coworkers as possible criminals.  In sum, we can discern no substantial risk of a miscarriage of justice.  See Rivera, 97 Mass. App. Ct. at 293-294.  Accord Commonwealth v. Shruhan, 89 Mass. App. Ct. 320, 324 (2016) ("Having elected to pursue this approach at trial, the defendant cannot change tactics on appeal based on the fact that he did not achieve the desired result").

8.  Amendment of indictments.  "Under the Sixth Amendment to the United States Constitution and art. 12 [of the Massachusetts Declaration of Rights], the defendant has a right to counsel at every 'critical stage' of the criminal process."  Commonwealth v. Johnson, 80 Mass. App. Ct. 505, 510

(2011), quoting <u>Commonwealth</u> v. <u>Woods</u>, 427 Mass. 169, 174 (1998).  "In order to constitute a critical stage, the accused must require assistance in 'coping with legal problems or assistance in meeting his adversary,' and the Sixth Amendment does not apply where there is no possibility 'that the accused might be misled by his lack of familiarity with the law or overpowered by his professional adversary.'"  <u>Commonwealth</u> v. <u>Sargent</u>, 449 Mass. 576, 580 (2007), quoting <u>United States</u> v. <u>Byers</u>, 740 F.2d 1104, 1118 (D.C. Cir. 1984).  See <u>Robinson</u> v. <u>Commonwealth</u>, 445 Mass. 280, 286 (2005) ("because the suppression hearing in this case would have required the taking of evidence and also involved the admissibility of substantial evidence that could determine the outcome of the case," suppression hearing was critical stage); <u>Commonwealth</u> v. <u>Medina</u>, 64 Mass. App. Ct. 708, 721 (2005) (right to counsel at hearings at which evidence is taken).

Here, as the fifteen-year statute of limitations approached in 2011,[13] the Commonwealth had a DNA profile of the suspect but did not know his identity.  See G. L. c. 277, § 63, as amended by St. 1996, c. 26.  Accordingly, the Commonwealth secured

---

[13] The statute of limitations for the kidnapping charge would have expired before this time, had the defendant remained a usual and public resident of Massachusetts.  See G. L. c. 277, § 63.  As it happened, the statute of limitations was tolled by the defendant's nonresidence.  See <u>Commonwealth</u> v. <u>White</u>, 475 Mass. 724, 731 (2016).

indictments against "John Doe, (a black male, approximately 5'11" tall, with a thin build, brown eyes, age 18-19 and identified by the DNA profile appended hereto in appendix A-CC#60-531557)."[14]  On March 20, 2014, after the defendant was identified, but before he was arraigned, the Commonwealth obtained an ex parte amendment of the indictments to substitute the defendant's name.

The defendant contends that he was entitled to the appointment of counsel for this prearraignment, prearrest hearing.  The right to counsel protected by the Sixth Amendment, however, does not attach "until the time of arraignment."  Commonwealth v. Celester, 473 Mass. 553, 567 (2016).  See Rothgery v. Gillespie County, Tex., 554 U.S. 191, 199 (2008), quoting 1 W.R. LaFave, J.H. Israel, N.J. King, & O.S. Kerr, Criminal Procedure § 1.4(g), at 135 (3d ed. 2007) (right to counsel "attaches at the [defendant's] initial appearance," when "the magistrate informs the defendant of the charge" against him and "determine[s] the conditions for pretrial release").  The Supreme Judicial Court has held the same with respect to the art. 12 right.  Celester, supra.  "The

_____

[14] In Commonwealth v. Dixon, 458 Mass. 446, 447-448 (2010), the Supreme Judicial Court held that a similar John Doe indictment, which identified the accused by his unique DNA profile and a physical description, comported with statutory requirements and had the legal effect of tolling the statutory limitations period.

arraignment signals 'the initiation of adversary judicial proceedings' and thus the attachment of the Sixth Amendment . . . ." <u>Michigan</u> v. <u>Jackson</u>, 475 U.S. 625, 629 (1986). Interpreting art. 12, the Supreme Judicial Court has consistently held that the right to counsel "attaches at the time judicial proceedings are commenced." <u>Commonwealth</u> v. <u>Neary-French</u>, 475 Mass. 167, 172 (2016). See <u>Commonwealth</u> v. <u>Ortiz</u>, 422 Mass. 64, 67 n.1 (1996) ("There is no authority for the proposition that the right to counsel under the Sixth Amendment . . . or under art. 12 . . . arises prior to arraignment"). Accordingly, the defendant had no right to counsel at the time of the amendment of the indictments.

9. <u>Conclusion</u>. The judgments are affirmed. The order of the single justice denying the defendant's motion to compel is affirmed.[15]

<u>So ordered</u>.

---

[15] The defendant also filed a notice of appeal of the denial of his motions for postconviction discovery. The defendant has not briefed the denial of these motions, so any issue regarding them is waived. See <u>Frias</u>, 53 Mass. App. Ct. at 495.